**In re NORTHWOOD PROPERTIES, LLC.**

**Civil Action No. 06–11781–WGY.**

United States District Court,
D. Massachusetts.

Dec. 7, 2006.

Sidney Bourne, Sudbury, MA, pro se.

Claudio M. Delise, Sudbury, MA, pro se.

Ralph S. Tyler, Sudbury, MA, pro se.

Alan L. Braunstein, Christopher Michael Condon, Jeffrey D. Ganz, Kristin M. Mc-Donough, Riemer & Braunstein LLP, Boston, MA, Robert Mann, Harnish, Jenney, Mitchell, & Resh, Waltham, MA, for Northwood Properties, LLC.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This fascinating case arises in the context of a bankruptcy proceeding. At stake are development rights potentially worth millions of dollars. The result is a barroom brawl for control of these rights. The appellee, Northwood Properties, LLC ("Northwood"), is a condominium developer, now in bankruptcy, that seeks to build new units to raise funds to pay off its debtors. The appellants, Sidney Bourne ("Bourne"), Claudio Delise ("Delise"), and Ralph Tyler ("Tyler"), have fired two shots in their battle for control of the development rights. First, Bourne and Delise contend that as unit owners, Northwood must obtain their consent before it can build any new units. Second, Bourne, Delise, and Tyler have all purchased small debts in order to have a say in the bankruptcy proceeding. Tyler additionally asserts a claim for over $600,000 in legal fees that Northwood vigorously disputes. Bourne, Delise, and Tyler contend that as holders of four of the five unsecured, non-insider claims, their approval is necessary for the confirmation of any reorganization plan.

The Bankruptcy Court held that the arguments advanced by the appellants missed their mark. The Bankruptcy Court subsequently confirmed the reorganization plan giving Northwood full control over development rights. This appeal followed.

## I. INTRODUCTION

### A. Factual and Procedural Background

#### 1. The Northwood at Sudbury Condominium

Northwood sought to develop the Northwood at Sudbury Condominium in five

phases.[1] The master deed for the first phase was recorded on December 9, 1998. Appellant Br. Stat. of Facts ¶ 1. The first phase consisted of twelve units. *Id.* ¶ 3. The master deed granted Northwood phasing rights that expired on December 9, 2005. *Id.* ¶ 2. The master deed for the second phase was recorded on May 20, 2002. *Id.* ¶ 4. The second phase also consisted of twelve units. *Id.* Bourne and Delise accepted and recorded unit deeds for two units in the second phase. *Id.* ¶¶ 5–6.

At the time that Bourne and Delise recorded their unit deeds, the master condominium deed granted Bourne and Delise each a 3.92% interest in the common areas and facilities. *Id.* ¶¶ 5–6. The master deed did not state what percentage interests Bourne and Delise would have following the completion of any additional phases. *See* Appellant App., Ex. 10; Ex. 12. The master deed stated only that if and when all five phases were completed, there would be sixty-six units. *Id.* ¶ 9.

Northwood completed just two phases in the seven years before its phasing rights expired. On June 16, 2005, Northwood negotiated an extension of phasing rights through December 9, 2010. Appellee Br. Stat. of Facts ¶ 9. In exchange for the extension of phasing rights, Northwood paid more than $700,000 to the condominium association, Northwood at Sudbury Condominium Trust (the "Association"). *Id.* Subsequently, Northwood filed for bankruptcy. *Id.* ¶ 10. Nonetheless, eighty-three percent of unit owners voted to ratify the revival of phasing rights,

more than the two-thirds majority required by the master deed. *Id.* ¶ 11. Bourne and Delise were the only unit owners who objected to the revival of phasing rights. *Id.*

## 2. The Bankruptcy Proceeding

At the time that Northwood filed its voluntary petition for bankruptcy, it had only five unsecured claims against it held by non-insider creditors: (1) $50.00 owed to NStar (the "NStar Claim"); (2) $50.00 owed to KeySpan (the "KeySpan Claim"); (3) $305.92 owed to GZA Environmental (the "GZA Claim"); (4) $622,270 allegedly owed to Tyler (the "Tyler Claim"); and (5) approximately $1.5 million owed to the Association (the "Association Claim"). *Id.* ¶ 14.

Tyler is the only appellant who held a claim against Northwood when it filed for bankruptcy. During the bankruptcy proceeding, Northwood filed an objection to this claim. *Id.* That claim is pending before the Bankruptcy Court. *Id.* ¶ 19. Bourne and Delise joined the fight in March 2006 when they purchased the NStar Claim for $50.00 and the GZA Claim for $305.92. *Id.* ¶ 15. For good measure, Tyler purchased the KeySpan Claim for $50.00. *Id.* Following these purchases, the appellants controlled four of the five unsecured, non-insider claims.

In May 2006, Northwood and Tashmoo, Northwood's largest creditor and its managing member, filed the First Amended Chapter 11 Plan of Reorganization of Northwood Properties, LLC ("First

---

1. As the Appeals Court of Massachusetts has explained:

> Phasing of a condominium permits a developer to expand the size and scope of a condominium project in response to market conditions. In a phased condominium development, groups or stages of units are completed over a period of several years and become part of the condominium by successive amendments to the master deed. "Phasing" is not a statutory term, but is a usage that has grown out of the general enabling provisions of G.L. c. 183A.

*Podell v. Lahn,* 38 Mass.App.Ct. 688, 689 n. 3, 651 N.E.2d 859 (1995) (citation omitted).

Amended Plan"). *Id.* ¶ 20. Among other terms and conditions, the First Amended Plan grouped the five non-insider, unsecured claims together in the same class. *Id.* ¶ 21. Under this plan, Northwood proposed that these five claims receive an initial distribution of five percent of their allowed amounts and, thereafter, receive a pro rata distribution from any proceeds from the eventual sale of either the phasing rights to a third-party developer or any condominium units developed by Northwood. *Id.* Bourne, Delise, and Tyler objected to the First Amended Plan asserting, among other things, that the First Amended Plan was not feasible. *Id.* ¶ 23. They filed a competing plan in which they would take over development of the condominium complex. *Id.* ¶ 22.

On July 11, 2006, Northwood and Tashmoo filed a Second Amended Plan. *Id.* ¶ 24. The Second Amended Plan created a new class of claims under Class 1 for all unsecured claims in an allowed amount less than $750.00. *Id.* ¶ 25. Class 1 consisted of the three claims acquired by Bourne, Delise, and Tyler during Northwood's bankruptcy proceeding. *Id.* The Second Amended Plan provided that those claims would be paid in full, immediately upon the date it became effective. *Id.*

The Second Amended Plan placed the disputed Tyler Claim in a separate class, identified as Class 2. *Id.* ¶ 26. Pursuant to the Second Amended Plan, the Tyler Claim would be paid in full upon the entry of a final, non-appealable order allowing that claim in a specific amount. *Id.* The parties dispute whether Northwood has sufficient assets to pay the Tyler Claim if and when it is allowed. *See* Appellant Br. at 33.

Finally, the Second Amended Plan created a third class for the Association Claim. Appellee Br. Stat. of Facts ¶ 27. Similar to its treatment in the First Amended Plan, this claim would be paid over time, subject to Northwood's proceeds from the sale of either phasing rights or any condominiums it developed. *Id.* Notwithstanding the proposed subordination of its claim, the Association voted for confirmation of the Second Amended Plan. *Id.*

Bourne, Delise, and Tyler contend that the Second Amended Plan is an impermissible gerrymander designed to deprive them of their voting rights. Under the Second Amended Plan, the Association was classified as the only impaired creditor and therefore the only party eligible to vote on the Plan's confirmation. Appellant Br. Stat. of Facts ¶ 21. Bourne, Delise, and Tyler had been eligible to vote under the First Amended Plan. *See Id.*

The Second Amended Plan did not, however, fully remove Bourne and Delise from the picture. Approval of the Second Amended Plan was contingent on Northwood obtaining an extension of phasing rights. Appellee Br. at 27. The phasing rights may be worth up to $3,000,000, more than enough to satisfy all debts. Appellant's Br. at 34. Bourne and Delise objected to the revival of phasing rights on the ground that as unit owners, their express consent is required before Northwood can build new units. *Id.* at 3.

The Bankruptcy Court held that while an adversary proceeding was the more appropriate vehicle for raising the phasing rights issue, the issue was sufficiently central to confirmation of the Second Amended Plan that it constituted a core proceeding under the Bankruptcy Code. Appellant Br., Ex. 1 ("Bankr.Tr."), at 2–3. Reaching the dispositive issue, the Bankruptcy Court held that Northwood had phasing rights because Bourne and Delise had given constructive consent as unit owners. *Id.* at 5–6. The Bankruptcy Court subse-

quently approved the Second Amended Plan. Appellee Br. Stat. of Facts ¶ 30.

Bourne, Delise, and Tyler filed their notice of appeal on September 27, 2006 [Doc. No. 1]. They filed their brief on November 10, 2006 [Doc. No. 10]. Northwood filed its appellee brief on November 11, 2006 [Doc. No. 15].

## II. DISCUSSION

### A. Jurisdiction and Standard for Review

■ This Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a). On appeal from a decision of a Bankruptcy Court, this Court sits as an intermediate appellate court and addresses such actions "in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts...." *Id.* § 158(c)(2); *see In re Ryan,* 282 B.R. 742, 747 (D.R.I.2002). The Court reviews the Bankruptcy Court's findings of fact under a clearly erroneous standard and rulings of law under a *de novo* standard. *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 73 (1st Cir. 1995).

### B. The Condominium Statute

■ This case requires this Court to interpret Massachusetts's condominium law, codified as chapter 183A of the General Laws. The Massachusetts Supreme Judicial Court has described chapter 183A as "essentially ... an enabling statute." *Kaplan v. Boudreaux,* 410 Mass. 435, 438, 573 N.E.2d 495 (1991) (citing *Barclay v. DeVeau,* 384 Mass. 676, 682, 429 N.E.2d 323 (1981)). The court has further described the statute as "provid[ing] plan-

ning flexibility to developers and unit owners." *Barclay,* 384 Mass. at 682, 429 N.E.2d 323. Thus, "those matters that are not specifically addressed in the statute are to be worked out by the involved parties." *Queler v. Skowron,* 438 Mass. 304, 312–13, 780 N.E.2d 71 (2002) (citation omitted).

In this case, Bourne and Delise assert that Northwood and the Association seek to intrude on their rights under the statute by contracting to the revival of phasing rights without their consent. Consequently, the Court must construe section 5, the statutory provision regulating the percentage interest that each unit owner has in the condominium's common areas and facilities. There are few Massachusetts cases interpreting section 5, but those cases provide this Court with clear guidance in applying the statute.

Section 5 is divided into several subsections, two of which are applicable in this case. Subsection 5(a) sets forth two requirements. First, each unit must have an "undivided interest in the common areas and facilities in the percentage set forth in the master deed."[2] Presumably, this means that each time new units are added, at least some preexisting units will see their percentage interests reduced.

Second, the percentage interest each unit has must be "in the approximate relation that the fair value of the unit on the date of the master deed bears to the then aggregate fair value of all the units."[3] The Appeals Court of Massachusetts has explained that there is no one correct formula for setting percentage interests. In *Podell v. Lahn,* 38 Mass.App.Ct. 688, 691,

---

2. Paragraph 5(b)(1) makes clear that this percentage interest may "not be separated from the unit to which it appertains."

3. Subparagraph 5(b)(2)(iii) provides for a limited exception to this requirement when a condominium association must reset percentage interests. This exception is described further below.

651 N.E.2d 859 (1995), the court stated that "[t]he computation process does not exclude the possibility . . . that in setting the percentage interests, units of the same size but with better locations in the condominium development, may be ascribed a higher 'fair value.'" The court noted that "[i]t is . . . possible, in comparing 'fair values' of various units in a phased condominium complex, that units which have amenities superior to those in the original buildings may be assigned a higher percentage interest." *Id.* The court conceded that the approximate relation of the fair value of a unit to the aggregate fair value of all the units "often reduces itself to a process of dividing a unit's floor area by the aggregate floor areas of all the units in the condominium." *Id.* Nonetheless, the court held that there is no strict formula for apportioning percentage interests of unit owners in common areas and facilities. *See id.* at 692, 651 N.E.2d 859.

Subsection 5(a) thus sets only general parameters for determining percentage interests. Subsection 5(b) sets forth rules for recalculating percentage interests when a developer wishes to build new phases. These statutory requirements are described below.

Subparagraph 5(b)(2)(iii) states that when a developer's phasing rights have expired, a condominium association may revive those rights by a three-fourths vote or lower percentage as the master deed may provide. *See Hutner v. Cape Codder Condo. Bd. of Trs.,* 52 Mass.App.Ct. 429, 432, 754 N.E.2d 138 (2001).[4] The statute was amended in 1998 to provide for what happens in the event that the master deed is silent as to what new percentage interests shall be when new phases are added. The condominium association may set a method or formula for determining the new percentage interests. The association must do so, however, in accordance with either subsection 5(a) or "another method which the organization of unit owners reasonably determines is fair and equitable under the circumstances." Mass. Gen. Laws ch. 183A, § 5(b)(2)(iii).

Paragraph 5(b)(1) places a further restriction on this grant of discretion in setting new percentage interests. Under this paragraph, the percentage interest of any unit owner may not be materially affected without that unit owner's consent. *See Suprenant v. First Trade Union Savs. Bank, FSB,* 40 Mass.App.Ct. 637, 641, 666 N.E.2d 1026 (1996). Under the statute, unit owners may give either express consent or constructive consent to material changes in their percentage interests.

The provision for constructive consent has been described as the codification of *Viola v. Millbank II Assocs.,* 44 Mass.App. Ct. 82, 86, 688 N.E.2d 996 (1997). *See Lebowitz v. Heritage Heights, Inc.,* 8 L.C.R. 295, 296 (2000). At the time *Viola* was decided, subsection 5(b) provided only for express consent. The court held that unit owners had given constructive consent when the master deed contained a table providing for the percentage interests at the completion of each phase. Although *Viola* did not state that such precise means of calculation were always required, the codification of its holding established such a requirement. Under the language of the statute, a unit owner gives constructive consent only when the master deed, at the time the unit deed was recorded, "made possible an accurate determination" of the unit's new percentage interest following the completion of any additional phases. Mass. Gen. Laws ch. 183A,

---

**4.** Under the same subparagraph, the developer must also obtain the approval of at least 51 percent of the number of all mortgagees holding first mortgages on units within the condominium who have given notice of their desire to be notified.

§ 5(b)(1). An *accurate* determination is possible only when the master deed, at the time the unit deed was recorded, provided for the ready calculation of precise percentages. If the unit owner must guess what his or her new percentage interest will be, then it is not possible for that unit owner accurately to determine his or her new percentage interest. Even educated guesses are not enough; by their nature estimates do not always prove accurate.

It was thus error for the Bankruptcy Court to hold that paragraph 5(b)(1) did "not require certainty" or a "strict formula." Bankr.Tr. at 6. The Bankruptcy Court committed further error when it held that when the master deed is silent, section 5 "may be fairly read to mandate a proportional fair value approach employing an appropriate methodology." *Id.* As discussed, Massachusetts law does not provide for a default methodology when the master deed is silent on the issue at the time that unit owners recorded their deeds. Subsection 5(a), and the case law interpreting it, mandate only that the percentage interests "approximate" the comparative fair values of the units. Such guidelines do not provide for ready calculations of reductions in a unit owner's percentage interests that may result from the addition of new units.

■■■ To summarize, section 5 requires a developer whose phasing rights have expired to seek the condominium association's approval in reviving those rights. If the developer wishes to exercise those rights, it must then obtain the consent of any unit owners whose percentage interests in common areas or facilities will be materially affected by the addition of new units. The developer must obtain the express consent of a unit owner if the master deed did not, at the time the unit owner's deed was recorded, make possible precise calculations of the unit owner's new per-

centage interest following the completion of additional phases. *See Suprenant,* 40 Mass.App.Ct. at 641, 666 N.E.2d 1026.

Northwood offered a construction of section 5 that is radically at odds with the plain words of the text. Northwood's read is that paragraph 5(b)(1) does not apply when a condominium association votes to revive a developer's phasing rights. In its view, subparagraph 5(b)(2)(iii)'s grant of authority to the condominium association to reset percentage interests trumps paragraph 5(b)(1)'s requirement that each unit owner consent to material alterations of his or her percentage interest. This interpretation, however, brushes up against paragraph (b)(2)'s limitation that its provisions are subject to subsection (b), which includes paragraph (b)(1)'s requirement that a developer obtain the consent of all unit owners whose percentage interests will be materially affected. Further, Northwood's interpretation would give developers the perverse incentive to let phasing rights expire so they can then revive phasing rights and build new units without necessarily having to obtain the approval of all unit owners who would see their percentage interests reduced. Such a construction of section 5 must be rejected.

■■ As the statute presently reads, it is thus possible for a developer to revive its phasing rights without the consent of every unit owner, so long as the developer obtains the approval of some required percentage of unit owners. Such phasing rights are worthless, however, if the developer cannot exercise those rights. Although it may sometimes be the case that a developer must obtain the express consent of every unit owner prior to exercising its phasing rights, this need not always be the case. For example, when unit owners give constructive consent, a developer need obtain only the express approval of three-fourths of unit owners, or some low-

er percentage, to revive phasing rights and immediately build new units.

Even when unit owners have not given constructive consent, developers need not always obtain the express consent of every unit owner to exercise its phasing rights. For instance, a condominium association may presumably exercise its discretion, within the constraints of subparagraph 5(b)(2)(iii), to reduce the percentage interests of some unit owners while leaving unchanged the percentage interests of other unit owners. The developer would then need to obtain the consent of only those unit owners whose percentage interests were reduced because paragraph 5(b)(1) does not require the developer to obtain the consent of unit owners whose percentage interests are not materially affected.[5]

Notably, this latter example was not always possible. Until 1987, section 5 required the condominium developer to obtain the consent of all unit owners, whether or not their percentage interests were materially affected. Further, subparagraph 5(b)(2)(iii)'s grant of authority to condominium associations to reset percentage interests was not made explicit until 1998. Taken together, the 1987 and 1998 amendments suggest that condominium associations have gained power vis-à-vis unit owners when a condominium association reaches a business deal with a developer prior to extending or reviving phasing rights that individual unit owners find unpalatable.[6] Whereas unit owners once had veto power whether or not their percentage interests were materially altered, a condominium association may now have the power to get around objecting unit owners by leaving their percentage interests unaffected.

■ The Court's construction thus gives life and force to the moving parts of section 5. Subparagraph 5(b)(2)(iii) governs the revival of phasing rights while paragraph 5(b)(1) requires unit owners to consent to any material alterations of their percentage interests. These two inquiries are distinct and must be analyzed independently of each other.

■ In the present case, Northwood successfully revived its phasing rights pursuant to subparagraph 5(b)(2)(iii) when it obtained the approval of eighty-three percent of unit owners. That much is clear. Less certain is the operation of paragraph 5(b)(1), which applies only if Bourne and Delise will see their percentage interests materially affected by the addition of new phases. Although the Association amended the master deed to revive Northwood's phasing rights, the record is silent as to what percentage interests will be following the completion of additional phases. The Association has apparently not exercised its power to set new percentage interests. *See* Appellee's App., Ex. 9. Since the parties assume that Bourne and Delise would see their percentage interests reduced following the addition of any new units, the Court will follow their lead and assume for present purposes that their percentage in-

---

5.  In *Lebowitz*, the Land Court overlooked this possibility when it assumed that additional phases would automatically lead to the reduction of every unit owner's percentage interest. 8 L.C.R. at 296.

6.  This case is a perfect illustration of the disputes that can arise between a condominium association and dissenting unit owners. Although the Association is not a party to this appeal, it is as much a participant in the brawl for development rights as are Northwood and the appellants. Northwood agreed to pay the Association $700,000 to revive its phasing rights and now owes the Association $1.5 million. Bourne and Delise disagree with this business decision and seek more. The Association has sided with Northwood, seeking to recover the $1.5 million that it is owed.

terests will in fact be reduced following the completion of additional phases and that therefore paragraph 5(b)(1) applies.[7]

Northwood acknowledged on appeal that at the time Bourne and Delise recorded their unit deeds, the master deed did not make it possible for them to calculate precisely what their new percentage interests would be following the completion of any additional phases. Transcript of Oral Argument [Doc. No. 19] at 6:11–20. Nor could Northwood have argued otherwise. The master deed is silent as to how to calculate future percentage interests. Further, as discussed, the statute and accompanying case law do not provide for a default methodology or formula for calculating new percentage interests when the master deed is silent on the issue.

Although Bourne and Delise could have made educated guesses what their new percentage interests might be, their guesses would have been nothing more than that—guesses. The master deed did not make possible the accurate determinations required by paragraph 5(b)(1). Therefore, their express consent is required to the extent that the addition of new units will materially affect their percentage interests. The statute is unambiguous on this point.

## III. Conclusion

This case has only further illustrated the rough and tumble that comes with the territory of lucrative development rights. Section 5 has functioned as a weapon for unit owners seeking control over development rights. Bourne and Delise have wielded this weapon to great effect, disrupting what might otherwise have been an orderly bankruptcy proceeding. It was error for the Bankruptcy Court to disarm Bourne and Delise by holding that they

had given their constructive consent when the master deed was silent as to how to calculate any changes to percentage interests following the completion of additional phases. Since confirmation of the Second Amended Plan was contingent on the phasing rights motion, the Court need not reach the issue whether that reorganization plan constitutes an impermissible gerrymander. Accordingly, the Court vacates the Bankruptcy Court's orders on the phasing rights motion and confirmation of the Second Amended Plan and remands for further proceedings consistent with this opinion.

SO ORDERED.

---

7. This assumption is not binding on the Bankruptcy Court, which must of course find the facts.