BEVERLY ANNE BARCLAY, trustee, *vs.* WILLIAM DeVEAU
& others[1].

Suffolk.  September 18, 1981. — December 10, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Condominiums*, Declaration of trust, Management.  *Statute*, Construction.  *Public Policy*.

A provision in a declaration of trust creating a condominium unit owners'
    organization which permitted the developer to appoint two of the
    three members of the organization's board of trustees and the unit
    owners to appoint only one trustee until such time as the developer
    owned fewer than twelve units, a number representing only a small
    percentage of the units in the condominium, was not violative of G. L.
    c. 183A, § 10, or contrary to public policy. [682-683]
Where the principal issue in a case was the enforceability of provisions in
    a declaration of trust creating a condominium unit owners' organiza-
    tion which were designed to protect the developer's interests during
    the marketing phase of a condominium development, this court re-
    manded the case to the Superior Court for a statement of the criteria
    the judge considered in determining that the condominium was still in
    the marketing phase and for consideration, apart from the marketing
    efforts, of what would be a reasonable period of time for the provisions
    to be enforceable. [683-686]

CIVIL ACTION commenced in the Superior Court on
May 24, 1978.

The case was heard by *Lee*, J., a District Court judge sit-
ting under statutory authority.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Peter B. Farrow* (*M. Frederick Pritzker* with him) for the
plaintiff.

---

[1] Tina Howell, Hal Lieberman, Regina Quinlan, and Ronald Rolly.

*Wade M. Welch (Regina L. Quinlan* with him) for the defendants.

LIACOS, J. At issue in this appeal is whether a provision contained in the declaration of a condominium trust that permits the condominium developer to appoint two of the three members of the board of trustees,[2] even though the developer owns only a small percentage of the condominium units, is invalid under G. L. c. 183A, § 10 (*a*). The statute provides: "Each unit owner shall have the same percentage interest in the corporation, trust or unincorporated association provided for in the master deed for the management and regulation of the condominium as his proportionate interest in the common areas and facilities. Such interest shall not be separated from ownership in the unit to which it appertains and shall be deemed conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument." G. L. c. 183A, § 10 (*a*), inserted by St. 1963, c. 493, § 1.

In apparent conflict with the statute is § 3.1.3 of the condominium trust which provides that "[u]ntil [the developer] owns less than 12 units, there shall not be more than three Trustees and it shall be entitled to designate two such Trustees."

The plaintiff, trustee of the Vendome Development Trust (development trust), filed a complaint in the Superior Court seeking to enjoin the defendants, who had been selected by the unit owners to replace the plaintiff's appointees, from exercising any power as trustees. The judge entered judgment for the plaintiff. On appeal, the Appeals Court, with one judge dissenting, reversed. *Barclay* v. *DeVeau*, 11 Mass. App. Ct. 236 (1981). We granted the plaintiff's application for further appellate review. G. L. c. 211A, § 11.

The facts are as follows. In 1975 the Franchi Development Trust, of which Pasquale Franchi is the sole beneficiary, established the Vendome Condominium Trust (condomini-

---

[2] The unit owners appoint the third trustee.

um trust). See G. L. c. 183A, §§ 1, 10. The Vendome is Boston's first mixed commercial and residential condominium. After the Franchi Development Trust defaulted on a construction loan with its mortgagee, the Commonwealth Capital Investment Corporation (CCIC), the name of the trust was changed to Vendome Development Trust, the former trustee resigned, and CCIC appointed the plaintiff as trustee to manage the condominium and market the unsold condominium units.[3] The plaintiff, as trustee of the development trust, appointed two trustees to the condominium trust pursuant to § 3.1.3 of the condominium trust.

In late 1977 the trustees of the condominium trust approved a 38% increase in common area charges.[4] At this time all but one of the 110 residential units had been sold. The developer, however, owned twenty-three of the commercial units, twenty of which were under long or short term leases, most with options to purchase.[5] At a special meeting called by the unit owners on May 23, 1978, the unit owners voted, by approximately a 60% majority, to remove the two appointed trustees, expand the board to seven, and appoint as new trustees the five persons who are the defend-

---

[3] At the time of the mortgage default, Pasquale Franchi pledged his beneficial interest in the development trust to the mortgagee, CCIC. Subsequently, CCIC assigned the beneficial interest to Milpo, Inc., an entity affiliated with a loan participant, the Mellon Bank of Pittsburgh.

[4] The increase in costs of operating the public areas and common facilities of the building, shared among all unit owners, was caused by increases in insurance premiums, maintenance, repair costs, and payroll. The management fee of $2,000 a month did not increase. The defendants do not contend that the trustees misrepresented the operating costs or otherwise acted fraudulently in this matter.

[5] Although neither side argues the issue in its brief, letters from the attorneys on file in the Appeals Court indicate that this case may be moot. The plaintiff's correspondence, filed before the release of the Appeals Court decision, states that the plaintiff sold her remaining interest in the condominium units and, therefore, the matter is now moot. We, however, agree with the defendants that the case is not moot since the validity of the May 23, 1978, election and the defendants' status as trustees are at issue in this case. See Baron v. Fontes, 311 Mass. 473, 477 (1942).

ants in this case.[6]  The unit owners purported to act under
§ 3.3 of the condominium trust, which grants the unit own-
ers the power to remove a trustee by a vote of the owners of
51% of the beneficial interest.  By the terms of § 3.3, how-
ever, this right is subordinate to the right of the develop-
ment trust under § 3.1.3 to retain the trustees of its choice
until fewer than twelve units remain unsold.[7]

The defendants, newly elected as trustees, claim that
§§ 3.1.3 and 3.3 of the trust violate G. L. c. 183A, § 10.[8]
The defendants argue that § 10 (a) requires that a unit
owner's percentage ownership interest in the association of
unit owners, set up for the management and regulation of
the condominium, be the same as his proportionate interest
in the common areas and facilities.  Although we agree that
the unit owners have a proportionate interest in the associa-
tion, we find nothing in the statute which prohibits the unit
owners from entering into valid agreements for manage-
ment and control of the condominium.  The fact that the
unit owners are entitled to a certain percentage interest in
the association does not necessarily mean that the owners
must have the same proportionate interest in management.

General Laws c. 183A, § 10 (a), states that "[e]ach unit
owner shall have the same percentage interest in the . . . trust
. . . provided for in the master deed for the management and
regulation of the condominium as his proportionate interest in
the common areas and facilities."  The defendants contend
that this "interest" must include power to appoint and remove
the trustees of the condominium trust and cannot be diluted

---

[6] The third member of the existing board, previously elected by the unit
owners, was to remain in office.  The seventh position on the new board
was to be filled by the development trust.

[7] Under the terms of the condominium trust, the trustees may amend
the trust with the consent of the holders of 75% of the beneficial interest.

[8] Section 2.1 of the condominium trust states that "this trust [is] the
organization of the Unit Owners established pursuant to the provisions of
section 10 of said Chapter 183A for the purposes therein set forth."  The
master deed and the confirmatory master deed of the Vendome Condo-
minium recite that the condominium is governed by and subject to G. L.
c. 183A.  See G. L. c. 183A, § 2.

through a developer control clause such as § 3.1.3. The plaintiff argues that a proportionate interest in the unit owners' association may be a beneficial one that includes, for example, rights in event of casualty losses (G. L. c. 183A, § 17) and the right to make and the obligation to pay for capital improvements (G. L. c. 183A, § 18), without including proportionate management rights.

1. *Legislative history of G. L. c. 183A.* We are mindful of the often-stated principle of statutory construction requiring us first to turn to the statutory language where it is plain and unambiguous for insight into the legislative purpose. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). But where the language of a provision is unclear, we may look to outside sources for assistance in determining the correct construction of the statute. *Massachusetts Mut. Life Ins. Co.* v. *Commissioner of Corps. & Taxation*, 363 Mass. 685, 690 (1973). Cf. *Rosenbloom* v. *Kokofsky*, 373 Mass. 778, 781 (1977). The crucial language of G. L. c. 183A, § 10 (*a*), is not free of ambiguity. To ascertain what the Legislature intended when it provided in G. L. c. 183A, § 10 (*a*), that unit owners have a proportionate "interest" in the trust set up for the management of the condominium, we turn to the legislative history.

The legislative history of G. L. c. 183A indicates that the Legislature was aware of precisely this issue when it enacted the statute, i.e., whether and by what means the unit owners would be able to control the management association. What is now G. L. c. 183A was first reflected in 1963 House Doc. No. 1708. Under §§ 2 (*d*), 18 & 19 of House 1708, the condominium would be administered by an unincorporated association whose by-laws were to be recorded as part of the declaration. This bill went further to structure that association and particularly referred to voting. Section 2 (*k*) defined a majority for voting purposes as those "apartment owners with fifty-one per cent or more of the votes in accordance with the percentages assigned in the declaration to the apartments for voting purposes." Section 19 of House 1708 required that the by-laws provide for election of a board

of directors for staggered terms from "among the apartment owners."

It was 1963 House Doc. No. 3324 that ultimately became G. L. c. 183A. Although retaining the concept of percentage interests expressed in House 1708 as the vehicle for shared ownership in the condominium (compare 1963 House Doc. No. 1708, §§ 6 [a] and 6 [b], with G. L. c. 183A, §§ 5 [a] and 5 [b]), the provisions of House 1708 dealing with voting rights and the specific structure of the owners' organization were deleted and § 10 (a) was substituted. Use of a corporate or trust form for the owners' association was approved, rather than the unincorporated form found in House 1708. The Legislature refrained from including any specific language as to voting rights in § 10 (a), which outlines the unit owners' powers of management, but retained certain limitations on majority rule by unit owners as set forth in House 1708.[9] The Legislature apparently intended to leave the matter of who shall control the management of the common areas and facilities of the condominium to discretionary agreement among the unit owners and the developer.[10] To infer that "interest" means "voting interest" would be to impose a structure in the association that the Legislature did not intend to require.[11] Cf. *Point East Management Corp. v. Point East One Condominium Corp.*, 282 So.2d 628, 629-630 (Fla. 1973), cert. denied, 415 U.S. 921 (1974) (legislative mandate that "operation of condominium shall be by the association" does not preclude association from contracting for management of condominium).

---

[9] Compare 1963 House Doc. No. 1708, §§ 8, 11 (9), and 16 (a), with G. L. c. 183A, §§ 5 (g), 17 (b), and 19 (a).

[10] We note that the concept of ownership interest separate from management interest is not foreign to our law. See, e.g., G. L. c. 156B, §§ 8, 13, 26, 41.

[11] A comparison of 1963 House Doc. No. 1708, §§ 12 (5) and 19 (l), with G. L. c. 183A, §§ 9 (f) and 12 (d), demonstrates that the Legislature intended to leave some aspects of condominium management open to the parties.

2. *Validity of § 3.1.3.* Although arguably the concept of a condominium[12] was not unknown to the common law, condominium as a form of real estate ownership did not flourish until statutory authorization. See Berger, Condominium: Shelter on a Statutory Foundation, 63 Colum. L. Rev. 987, 1002 (1963); Schwartz, Condominium: A Hybrid Castle in the Sky, 44 B.U. L. Rev. 137, 139-144 (1964). The apparent purpose of c. 183A "was to clarify the legal status of the condominium in light of its peculiar characteristics." *Grace* v. *Brookline*, 379 Mass. 43, 52 (1979). Statutes like c. 183A which imprint the condominium with legislative authorization are essentially enabling statutes. Rosenstein, Inadequacies of Current Condominium Legislation — A Critical Look at the Pennsylvania Unit Property Act, 47 Temple L.Q. 655, 683 n.75 (1974). Schwartz, *supra* at 138. This statute provides planning flexibility to developers and unit owners. See P. Rohan & M. Reskin, Condominium Law & Practice § 5.04, at 5-26 (1981). Unless expressly prohibited by clear legislative mandate, unit owners and developers may validly contract as to the details of management.

Absent overreaching or fraud by a developer,[13] we find no strong public policy against interpreting c. 183A, § 10 (*a*), to permit the developer and unit owners to agree on the details of administration and management of the condominium unit.[14] Public policy actually favors this in-

---

[12] For a succinct definition of the condominium form of ownership see Rohan, The "Model Condominium Code" — A Blueprint for Modernizing Condominium Legislation, 78 Colum. L. Rev. 587, 587 n.3 (1978).

[13] There is no allegation that the plaintiff, as trustee of the development trust, or the trustees of the condominium trust violated a fiduciary relationship with the unit owners by failing to act in good faith in exercising their management duties.

[14] The defendants, in their requests for rulings of law, raised the issue of the proper interpretation of the word "units" as used in the Vendome Condominium Trust. The defendants presented evidence that a purchaser of a residential condominium would believe that the residential unit owners would control the management of the Vendome Condominium when the developer had sold all but twelve of the residential units. Al-

terpretation.  See *Beaver Lake Ass'n* v. *Beaver Lake Corp.*, 200 Neb. 685 (1978) (provisions of by-law giving corporate developer authority to appoint majority of board of directors of homeowners' association not void ab initio as against public policy).  Expert testimony at trial established that developer control clauses similar to § 3.1.3 of the condominium trust are common in Massachusetts.  See generally Condominium Law 37, 64 (MCLE-NELI 1978) (including use of developer control clauses in drafting condominium documents).  The developer and its mortgagee risk a great deal undertaking a condominium and, to protect their large investment, may need to maintain control of the project for a specific period of time.  See Uniform Condominium Act (1977), 7 U.L.A., § 3-103, Comment 3 (Master ed. 1978) (recognizing practical necessity of developer control during development phase of condominium project); 1 A. Ferrer & K. Stecher, Law of Condominium § 473, at 314 (1967) (developer desires effective role in project management if unsold units remain).  Cf. D. Clurman & E. Hebard, Condominiums and Cooperatives 52 (1970) (unit mortgagees ordinarily impose controls on major management decisions by condominium boards).

The condominium trust in this case contains no express time limit on the developer's control.  Under the express terms of the condominium trust the developer may retain control of the unit owners' association as long as twelve units are unsold.  The defendants filed requests for rulings of law,

---

though the judge made no specific finding as to the meaning of the word "units," we assume, because the judge denied the defendants' requests for rulings of law on this issue, that the judge interpreted the word "units" to mean commercial or residential units.  The defendant has failed to argue on appeal any error on this issue.  We therefore deem any claim of error to be waived.  See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).  We note, also, that the defendants do not allege that purchasers lacked access to any of the condominium documentation.  See *Point East Management Corp.* v. *Point East One Condominium Corp.*, 282 So.2d 628, 630 (Fla. 1973), cert. denied, 415 U.S. 921 (1974) (because condominium documentation available to purchasers, enforcement of contract cannot be said to work hardship).

one of which stated: "Because no time unit [*sic*] is placed on the power granted to the Vendome Development Trust by Article III, Section 3.1.3, the power, even if valid, will only be enforced for a reasonable period of time." The trial judge allowed this request, and the plaintiff concedes that a limitation of a reasonable period of time is properly placed on such a clause. Consequently, we need not determine whether such a limitation of time is necessarily implicit or will be imposed as a matter of policy on such provisions.[15]

It is arguable, however, that an agreement designed to protect the developers' interests during the development and marketing phase of a condominium implicitly contains limitations of time on such a phase. See *Miller* v. *Campello Co-op. Bank*, 344 Mass. 76, 79 (1962). See also *Catania* v. *Hallisey*, 352 Mass. 327, 331 (1967) (contractual clauses that restrict another's rights, unlimited in time, enforceable for reasonable period of time). "What is a reasonable time is a question of law, to be determined in reference to the nature of the contract and the probable intention of the parties as indicated by it." *Warren* v. *Ball*, 341 Mass. 350, 353 (1960), quoting from *Campbell* v. *Whoriskey*, 170 Mass. 63, 67 (1898). A reasonable period of time is the period necessary to carry out the supposed intention of the parties, see 1 S. Williston, Contracts § 38 (3d ed. 1957), i.e., protect the developer while it is at risk. Such a view would be consistent with the basic concept of condominium, i.e., that unit owners will be afforded a proportionate voice in the management of the common areas and facilities. Schwartz, *supra* at 144.

We note that the judge treated the "marketing phase" of a condominium project as a reasonable period of time in which the developer may maintain control of the unit owners' association. The marketing phase of the condominium is that time during which the developer actively engages in selling

---

[15] Compare our treatment of employee convenants not to compete which are enforceable only to the extent necessary to protect the legitimate business interests of the employer. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671 (1977). *Marine Contractors Co.* v. *Hurley*, 365 Mass. 280 (1974).

the condominium units.[16] Notwithstanding this good faith effort, however, a point in time may be reached where, despite the presence of unsold units, the developer must relinquish control.[17]

The record before us does not clearly indicate what criteria the judge considered in determining that the Vendome Condominium was still in the marketing phase, nor does it reveal whether he considered the question of reasonable time apart from marketing efforts. In the amended findings and judgment, the judge stated that "[t]he primary aim of the

---

[16] Indicia of the "marketing phase" may include incomplete construction, retention of real estate brokers, advertisement in trade journals and local newspapers, and maintenance of a sales office. This list is neither exhaustive nor exclusive.

[17] Although the Legislature has not adopted those portions of the Uniform Condominium Act dealing with developer control of a condominium association, § 3-103 (d)-(e) of the Act may present useful guidelines to a trial judge in determining the reasonableness of developer control in terms of time, percentage interest owned, and marketing efforts. The relevant portions are as follows: "(d) Subject to subsection (e), the declaration may provide for a period of declarant control of the association, during which period a declarant, or persons designated by him, may appoint and remove the officers and members of the executive board. Regardless of the period provided in the declaration, a period of declarant control terminates no later than the earlier of: (i) [60] days after conveyance of [75] percent of the units which may be created to unit owners other than a declarant; (ii) [2] years after all declarants have ceased to offer units for sale in the ordinary course of business; or (iii) [2] years after any development right to add new units was last exercised. A declarant may voluntarily surrender the right to appoint and remove officers and members of the executive board before termination of that period, but in that event he may require, for the duration of the period of declarant control, that specified actions of the association or executive board, as described in a recorded instrument executed by the declarant, be approved by the declarant before they become effective.

"(e) Not later than [60] days after conveyance of [25] percent of the units which may be created to unit owners other than a declarant, at least one member and not less than [25] percent of the members of the executive board must be elected by unit owners other than the declarant. Not later than [60] days after conveyance of [50] percent of the units which may be created to unit owners other than a declarant, not less than [33⅓] percent of the members of the executive board must be elected by unit owners other than the declarant." Uniform Condominium Act (1980), 7 U.L.A., § 3-103 (d)-(e) (Master ed. supp. 1981).

Vendome Development Trust under Franchi's and the mortgage[e]'s direction, has been to sell the units and since twenty-three (23) commercial units were unsold, the Vendome Condominium was still in the marketing phase." As stated earlier, however, the inquiry is not whether a particular number of units remain unsold, but whether the developer is actively engaged in a bona fide effort to sell the units, and whether, in any event, the circumstances, considered as a whole, require a conclusion that control must pass to the unit owners.

3. *Conclusion.* We set aside the judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*