STEPHEN J. SCULLY, trustee,[1] & others[2] *vs.* KATHLEEN
TILLERY, trustee,[3] & others.[4]

Suffolk. January 7, 2010. - May 14, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Condominiums,* Master deed, Declaration of trust, Common area, Common expenses, Management. *Real Property,* Condominium.

In a civil action arising from a dispute between owners of units built during the first phase of development of a condominium (phase I owners) and owners of units built during the second phase (phase II owners), the judge in the Land Court did not err in granting summary judgment in favor of the phase I owners, where certain provisions in amendments to the condominium's master deed and declaration of trust, allocating percentage interest in the common areas and facilities of the condominium in a way that favored the phase I owners, were enforceable, in that the waiver by the condominium developer, as part of a settlement agreement with the condominium's board of trustees regarding pending litigation between them, of the rights protected by the proportionality provision of G. L. c. 183A, § 5 (*a*), did not contravene public policy, and the phase II owners purchased their units with notice of the amendments to the master deed and declaration of trust [768-775]; and where other provisions in the amendments to the master deed and declaration of trust, establishing procedures for the election of members of the board of trustees and for amendment to the master deed or declaration of trust, did not violate the requirement in G. L. c. 183A, § 10 (*a*), that unit owners of a condominium have a proportionate interest in the condominium's association of unit owners, in that public policy favors permitting developers and unit owners to agree on the details of administration and management of the condominium [775-777].

CIVIL ACTION commenced in the Land Court Department on December 22, 2004.

The case was heard by *Gordon H. Piper*, J., on motions for summary judgment.

[1]Of S & J Cape Realty Trust.

[2]Other owners of the twenty units built in the second phase of the Cape Codder Condominium development (phase II owners).

[3]Of Cape Codder Condominium Trust.

[4]Kathleen Taylor, Samuel I. Gutter, Stephen Waxman, and William P. Baltz, as trustees of Cape Codder Condominium Trust; and other owners of the twenty units built in the first phase of the Cape Codder Condominium development (phase I owners).

The Supreme Judicial Court granted an application for direct appellate review.

*Brian M. Hurley* for the plaintiffs.

*Michael P. Angelini* for the defendants.

MARSHALL, C.J. The Cape Codder Condominium development in Falmouth (condominium) was built in two phases, the first of which was completed in 1989, the second in 1999.[5] This case concerns a dispute between owners of units built during the first phase (phase I owners) and owners of units built during the second phase (phase II owners). The plaintiffs, the phase II owners, claim that certain provisions in amendments to the condominium's master deed and declaration of trust (recorded amendments) violate § 5 (*a*) and § 10 (*a*) of G. L. c. 183A, the condominium statute, and are therefore not valid or enforceable. The amendments, recorded in 1999 and 2000, were to effectuate a 1998 settlement agreement between the condominium's board of trustees (board) and the condominium developer that ended then pending litigation between them.[6] The settlement agreement paved the way for the construction of the second phase on terms (later reflected in the recorded amendments) substantially more favorable to the phase I owners than to the future phase II owners.

Specifically, the phase II owners argue that certain provisions

---

[5] "In a phased condominium development, groups or stages of units are completed over a period of several years and become part of the condominium by successive amendments to the master deed. 'Phasing' is not a statutory term, but is a usage that has grown out of the general enabling provisions of G. L. c. 183A." *Queler* v. *Skowron*, 438 Mass. 304, 312 n.15 (2002), quoting *Podell* v. *Lahn*, 38 Mass. App. Ct. 688, 689 n.3 (1995).

[6] The original developer of the condominium, Sippewisset Development Limited Partnership (Sippewisset), constructed the first phase of the condominium development and recorded the original master deed in 1989. In 1996, the development rights for the second phase were assigned to Cape Codder Enterprises Limited Partnership (Cape Codder Enterprises), whose principal, Petros A. Palandjian, was a general partner of Sippewisset. In 1997, the rights were assigned to an unrelated entity, Stuborn Limited Partnership (Stuborn), for value. Stuborn entered into the settlement agreement with the board of trustees (board) in 1998. The development rights subsequently were assigned to Olde Cape Codder Limited Partnership (Olde Cape Codder), whose general partner is Olde Cape Codder Corporation, both affiliates of Stuborn. Olde Cape Codder held the development rights when, after the construction of the second phase of the condominium and in circumstances we later describe, the master deed (1999) and the declaration of trust (2000) were amended (recorded amendments).

in the recorded amendments allocating percentage interest in the common areas and facilities of the condominium to each unit owner (allocation of interest provisions) violate G. L. c. 183A, § 5 (*a*), which provides in pertinent part that each unit owner in a condominium is entitled to an undivided percentage interest in the common areas and facilities that "shall be in the approximate relation that the fair value of the unit on the date of the master deed bears to the then aggregate fair value of all the units."[7] The phase II owners also argue that other provisions in the recorded amendments establishing procedures for the election of members of the board that in essence give the phase I owners a majority control of the board, and requiring the consent of more than two-thirds of the phase I owners to amend the master deed or declaration of trust adversely to the interests of the phase I owners (management provisions), violate G. L. c. 183A, § 10 (*a*). That provision of c. 183A provides in pertinent part that each unit owner "shall have the same percentage interest in the corporation, trust or unincorporated association provided for in the master deed for the management and regulation of the condominium as his proportionate interest in the common areas and facilities."[8]

A judge in the Land Court allowed the phase I owners' motion for summary judgment. Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). The judge concluded that the provision of G. L. c. 183A, § 5 (*a*), at issue was waived by the developer in the 1998 settlement agreement, that waiver of that provision by agreement is not precluded by any public policy, and that the

---

[7]General Laws c. 183A, § 5 (*a*), provides: "Each unit owner shall be entitled to an undivided interest in the common areas and facilities in the percentage set forth in the master deed. Such percentage shall be in the approximate relation that the fair value of the unit on the date of the master deed bears to the then aggregate fair value of all the units."

The phase II owners do not dispute that the percentage of undivided interest in the common areas and facilities allocated to each unit owner is "set forth in the master deed." *Id.*

[8]General Laws c. 183A, § 10 (*a*), provides: "Each unit owner shall have the same percentage interest in the corporation, trust or unincorporated association provided for in the master deed for the management and regulation of the condominium as his proportionate interest in the common areas and facilities. Such interest shall not be separated from ownership in the unit to which it appertains and shall be deemed conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument."

waiver is effective against the phase II owners who purchased their units with notice of the challenged provisions in the recorded amendments. As to G. L. c. 183A, § 10 (*a*), the judge concluded that the disputed provisions in the recorded amendments concerning election of the members of the board and future amendments to the master deed or declaration of trust do not contravene the statute. We granted the phase II owners' application for direct appellate review.[9] For the reasons stated below, we now affirm.

1. *Facts.* We summarize the undisputed facts as recounted by the judge and supplemented where necessary by uncontroverted evidence from the record below, reserving discussion of certain facts to later sections of this opinion.

The first phase (phase I) of the Cape Codder Condominium consisted of twenty units (phase I units).[10] On October 19, 1989, after construction of the phase I units was completed, the original master deed was recorded in the Barnstable registry of deeds (registry) by the Sippewisset Development Limited Partnership (Sippewisset) as the condominium's declarant (developer), pursuant to G. L. c. 183A, §§ 8 and 16.[11] The master deed reserved to the developer the rights to construct a second phase (phase II) on part of the common area of the condominium within a ten-year period ending October 19, 1999. As envisioned at the time, phase II would include a new building containing forty-seven units, as well as a "clubhouse" containing one additional unit to be owned by the board, i.e., a total of forty-eight

---

[9]The Land Court judge allowed the motion of Olde Cape Codder Corporation to intervene. Mass. R. Civ. P. 24, 365 Mass. 769 (1974). See note 6, *supra*. The intervener's complaint incorporated by reference certain of the allegations set forth in the phase II owners' complaint and sought analogous relief. The judge denied that relief in his decision allowing the phase I owners' motion for summary judgment. The intervener did not appeal.

[10]Fourteen of the phase I units are located in two buildings known as the Naushon Residences (Naushon units). The remaining six phase I units are located in two buildings known as the Cuttyhunk Residences (Cuttyhunk units).

[11]General Laws c. 183A, § 8, provides, in pertinent part: "The master deed shall be recorded in the registry of deeds or the land registration office where the real estate is located and shall contain the following particulars: — [listing elements]."

General Laws c. 183A, § 16, provides, in pertinent part: "The owners of any land may submit the same to the provisions of this chapter by the recording in the registry of deeds of a master deed . . . ."

units.[12] Section 14 of the master deed provided that, on construction of phase II with its forty-eight contemplated units, the percentage interest in the common areas and facilities allocated to each of the phase I units in the master deed would be "multiplied by (.3141)," such that the owners of the phase I units would then hold, in aggregate, 31.41% of the total interest. The master deed called for the remaining 68.59% interest to be divided among the forty-eight units to be built during phase II (phase II units).[13]

In 1996, some three years before the development rights for the construction of phase II were to expire, Sippewisset assigned those rights to Cape Codder Enterprises Limited Partnership (Cape Codder Enterprises). See note 6, *supra*. Cape Codder Enterprises sought to reduce the size of the new building proposed for construction in phase II, and requested that the phase I owners consent to revise the 31.41% and 68.59% allocation of percentage interests set forth in the original master deed by increasing the allocation to the phase I owners to reflect

---

[12]The original master deed did not describe with specificity the scope of phase II. It reserved to the developer the right to construct a "new building" and "one additional Unit at the clubhouse," in compliance with "conditions contained in a Special Permit issued by the Town of Falmouth on August 26, 1987 . . . and an Order of Conditions dated August 5, 1987 . . . as the same may be amended from time to time." The parties do not dispute that the original plan for phase II, as described in the special permit and order of conditions referenced in the original master deed, included a new building consisting of forty-seven units and an additional "clubhouse" unit.

[13]On completion of phase II, the original master deed stated that the percentage interest of each unit would be set as follows:

"(a) A recalculated undivided interest in the common areas and facilities of the Condominium (the 'Percentage Interest') as amended will be determined for each of the [phase I units], which shall be the product of the Percentage Interest of each such Unit as set forth in Exhibit B multiplied by (.3141) and rounded to the nearest hundredth of a percentage.

"(b) The sum of the Percentage Interest of all the new Units at New Building Five and the Clubhouse Unit, which are added to the Condominium shall be one hundred minus the sum of the Percentage Interests of the [phase I units] as calculated in (a) above.

"(c) The calculation and recalculation of the Percentage Interest shall be made in compliance with the provisions of Chapter 183A, Section 5."

the expected market values of the units in the two phases under the developer's proposed plans. The phase I owners did not give their consent. Cape Codder Enterprises then terminated its plans to construct phase II and, in January, 1997, assigned the development rights to Stuborn Limited Partnership (Stuborn), an entity unconnected to Cape Codder Enterprises. See note 6, *supra.* The assignment of development rights was recorded in the registry on January 10, 1997, and recites a consideration of $1,035,000.

Stuborn, acting through its principal, Stuart Bornstein, proposed to the board a plan for the development of phase II that contemplated, among other things, a different number and configuration of units than envisioned in the original master deed. The board rejected the plan. When Stuborn nevertheless pressed forward with its plans, the board asked the Falmouth building commissioner to refuse to grant any building permits for the construction of phase II in accordance with Stuborn's proposed plans. The building commissioner denied the request, and in August, 1997, the zoning board of appeals of Falmouth (zoning board) upheld that decision.

In September, 1997, the board commenced an action in the Land Court challenging the decision of the zoning board, arguing, among other things, that construction of phase II in accordance with Stuborn's proposed plans would violate the town of Falmouth's zoning bylaws. As noted by the judge in the Land Court, without a resolution of the board's action, Stuborn was unable to proceed with development of phase II as it proposed, and its rights to do so were to expire in October, 1999.

In July, 1998, Stuborn and the board entered into a settlement agreement resolving the pending action in the Land Court, which was then dismissed.[14] The settlement agreement provided for Stuborn to construct a new building containing twenty, rather than forty-eight, units, under agreed on plans — a development of phase II with a total floor area approximately one-third smaller than contemplated in the 1989 master deed. The settlement agreement provided for, among other things, the execution and recording of amendments to the condominium's master deed

---

[14]The stipulation of dismissal was filed in February, 1999.

and declaration of trust (as set forth in attached forms) that would establish the following terms.

First, the 31.41% to 68.59% division of percentage interests in the common areas and facilities between the phase I and phase II units set forth in the original master deed was to remain unchanged, notwithstanding the substantial reduction in size and number of units to be constructed in phase II. Second, condominium expenses were to be separated into four categories, with the responsibility for those expenses divided between the phase I and phase II owners in defined proportions. Specifically, all condominium expenses "relating to the maintenance, repair and/or replacement (including reserves)" of the phase II building and its common areas were to be borne solely by owners of the phase II units. The phase II owners were to pay any legal fees, engineering fees, or other costs relating to the construction of phase II. All "management fees"[15] were to be allocated one-half to the phase I owners and one-half to the phase II owners, while all other common expenses were to be allocated 31.41% in the aggregate to the phase I owners, and 68.59% in the aggregate to the phase II owners. Third, the board was to consist of five members, three elected by the phase I owners[16] and two elected by the phase II owners. Fourth, future amendments to the master deed or declaration of trust that would "adversely affect the interests" of the phase I owners would not be permitted without the written approval of sixty-seven per cent or more of the aggregate beneficial interests of the phase I units, effectively giving the phase I owners the authority to veto future amendments of the master deed or declaration of trust adverse to their interests.[17] Following execution of the settlement agreement in July, 1998, Stuborn proceeded with construction of phase II, building twenty condominium units.

---

[15]The subsequent amendment to the declaration of trust defined "management fees" as including any fees paid, and out-of-pocket expenses reimbursed, to any professional management company retained by the board to manage the common areas and affairs of the condominium. See note 19, *infra.*

[16]Two members of the board were to be elected by the owners of the fourteen Naushon units, and one member was to be elected by the owners of the six Cuttyhunk units. See note 10, *supra.*

[17]As part of the settlement agreement, Stuborn also agreed to pay the board $50,000; undertook to install or upgrade certain infrastructure work, including irrigation, paving, and utility work; and waived any right to construct or sell

On October 18, 1999, one day before the expiration of the ten-year period for the development of phase II, a certificate of extension of development rights (certificate) was recorded in the registry, pursuant to which the board agreed to extend the development rights through December 31, 1999, with a conditional opportunity for further extension.[18] The certificate stated, among other things, that the board had entered into a settlement agreement with Stuborn dated July 31, 1998, the terms and provisions of which "are expressly incorporated herein."

Construction of the phase II units was completed some time in late 1999, and the developer, with the approval and consent of the board, recorded amendments to the master deed and declaration of trust in keeping with the settlement agreement signed one year earlier. Specifically, on October 7, 1999, an amendment to the master deed (master deed amendment) was recorded in the registry by Olde Cape Codder Limited Partnership (Olde Cape Codder), an affiliate of Stuborn that was then holding the development rights. See note 6, *supra*. The master deed amendment added twenty phase II units to the condominium, see G. L. c. 183A, § 8, and reallocated the percentage interests of the phase I units in accordance with the settlement agreement, i.e., allocating 31.41% among the twenty phase I units and 68.59% among the twenty phase II units, setting forth with specificity the percentage interest allocated to each individual unit in both phase I and phase II (allocation of interest provisions). See note 28, *infra*. Seven months later, on May 17, 2000, the board, with the consent of Olde Cape Codder, recorded an amendment to the declaration of trust (trust amendment) similarly containing provisions agreed on in the settlement agreement. Specifically, the trust amendment memorialized, among other things, the provisions of the settlement agreement prescribing the division of responsibility for condominium expenses between the phase I and phase II owners,[19] the procedures for electing members of the

to the board the clubhouse unit. Those provisions of the settlement agreement are not at issue here.

[18] The board, Stuborn, and Olde Cape Codder were parties to this instrument. Olde Cape Codder had been assigned and was then holding the development rights. See note 6, *supra*.

[19] Paragraph 5 of the trust amendment states, in pertinent part:

"(i) any and all expenses relating to the maintenance, repair and/or

board,[20] and the procedures for approving amendments to the master deed or declaration of trust that would adversely affect the interests of the phase I owners.[21]

replacement (including reserves) of the New Building and any common areas constructed by the Declarant in connection therewith and serving only the occupants of said New Building shall be borne solely by the Unit Owners in said building, (ii) any legal fees, engineering fees and/or other costs and expenses relating to the construction of said New Building and related improvements (whether such fees are directed at the Declarant or any other party) shall likewise be borne exclusively by the Owners of Units in said building; (iii) any management fees (which term is intended to include any fee[s] paid, and out-of-pocket expenses reimbursed, to any professional management company retained by the Trustees to manage the common areas and affairs of the Condominium) relating to the Condominium shall be allocated one-half to the 20 existing Naushon and Cuttyhunk Units and one-half to the Units in said New Building (notwithstanding any contrary or inconsistent provision set forth above or elsewhere in the Declaration of Trust); and (iv) all other General Common Area Expenses shall be allocated per Section 14 of the Condominium's Master Deed (i.e., 31.41 percent in the aggregate to the Owners of the 20 Naushon and Cuttyhunk Units, and the remaining 68.59 percent in the aggregate to the Units in the said New Building)."

[20]Paragraph 3 of the trust amendment states, in pertinent part:

"Notwithstanding any contrary or inconsistent provision set forth in Article III of the Declaration of Trust, commencing with the first Annual Meeting after the Declarant amends the Condominium's Master Deed to add to the Condominium an additional and final phase of 20 more units constructed in one free-standing building (the 'New Building') by the undersigned Declarant, the Condominium's Board of Trustees shall be comprised of five Members. Two of such Members shall be elected by the Unit Owners of the 14 so-called Naushon Units, two of such Members shall be elected by the Unit Owners of the New Building other than the Declarant (or any Successor Declarant, or any affiliates or parties related to same), and one Member shall be elected by the Unit Owners of the six so-called Cuttyhunk Units. All of such Members shall be elected by the above-described categories of Unit Owners based upon relative percentage interests of Unit Owners within such categories so voting. . . ."

Paragraph 3 of the trust amendment also prescribes a modified method for electing members of the board for the period during which the developer retained ownership of unsold phase II units, after the first such unit was sold.

[21]Paragraph 4 of the trust amendment states:

"Notwithstanding any contrary or inconsistent provision set forth in Article VII of the Declaration of Trust, there may be no subsequent amendments to either the Condominium Master Deed or to the Declara-

The developer subsequently commenced selling the phase II units. Beginning with the first sales of the phase II units, the phase I and phase II owners have paid the condominium expenses, elected members of the board, and voted on proposed amendments to the master deed and declaration of trust generally in accordance with the provisions of the recorded amendments.

In late 2003, in response to requests by the phase II owners, the board retained an independent appraiser to assess the fair market values of all the units as of October 7, 1999, the date that the master deed amendment was recorded.[22] The appraiser reported that as of that date, the market value of the phase I units was 51.49% of the total value of the condominium, and the market value of the phase II units was 48.49% of the total. The phase II owners subsequently sought the consent of the phase I owners to alter the allocation of interest provisions to reflect those values. Some of the phase I owners agreed to the request, but six did not, and the effort did not succeed. A similar effort by the phase II owners to alter the constituency of the board failed because it did not receive sixty-seven per cent support from the phase I owners, as required by the trust amendment.

The phase II owners thereupon instituted this action in December, 2004, seeking (1) judgments declaring that the allocation of interest provisions and management provisions in the recorded amendments violate G. L. c. 183A; (2) injunctive relief amending the master deed and declaration of trust to conform to G. L. c. 183A; (3) damages for their respective "overpayment" of general common area expenses; and (4) attorney's fees and other expenses. We turn now to the merits.

2. *Discussion.* Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c). *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982). "When the court considers the materials accompanying a motion for summary judgment, 'the inferences

---

tion of Trust which would adversely affect the interests of the owners of the 20 Naushon and Cuttyhunk Units without the written approval of 67% or more of the aggregate beneficial interests of such 20 Naushon and Cuttyhunk Units."

[22]The parties dispute the reason for the board's action, a fact not material to our analysis.

to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.' " *Id.* at 371, quoting *Hub Assocs.* v. *Goode*, 357 Mass. 449, 451 (1970). We consider, in turn, the phase II owners' various claims concerning the allocation of interest provisions and the management provisions in the recorded amendments through the lens of these strictures.

a. *Allocation of interest provisions.* The phase II owners first claim that the allocation of interest provisions in the master deed amendment violate G. L. c. 183A, § 5 (*a*), which states, as noted earlier, that each unit owner in a condominium is entitled to an undivided percentage interest in the common areas and facilities that "shall be in the approximate relation that the fair value of the unit on the date of the master deed bears to the then aggregate fair value of all the units" (proportionality provision of § 5 [*a*]). See note 7, *supra.* It is undisputed that the 31.41% to 68.59% division of interest in the common areas and facilities between the phase I owners and the phase II owners in the master deed amendment does not reflect the approximate relation of the fair values of the respective units to the aggregate fair value of all the units on October 7, 1999, the date of the recording of the master deed amendment.[23] The phase I owners argue that the allocation of interest provisions in the master deed amendment is nevertheless enforceable because (1) the proportionality provision of § 5 (*a*) may be waived, and was waived by the developer, and (2) the phase II owners cannot now challenge those provisions because they purchased their units with notice of the nonconformity with § 5 (*a*). We agree.

(i) *Waiver of G. L. c. 183A, § 5 (a).* We consider first whether the proportionality provision of § 5 (*a*) may be waived by agreement. It is settled that a statutory right may be waived where the waiver "would not frustrate the public policies of the statute." *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 377 (1990). To that end we have long recognized that a waiver of statutory rights is permissible when the purpose of the statute is

---

[23]As noted earlier, the independent appraiser hired by the board in 2003 reported that the market values of the phase I and phase II units on the date of the recording of the master deed amendment in October, 1999, were 51.49% and 48.49% of the total value of the condominium, respectively. The phase I owners do not challenge the accuracy of that appraisal.

the "protection of the property rights of individual parties" rather than "the protection of the general public." *Id.* at 378, quoting *Continental Corp.* v. *Gowdy*, 283 Mass. 204, 218 (1933). See *Washington Nat'l Bank* v. *Williams*, 188 Mass. 103, 107 (1905) (debtor waived statutory right enacted for benefit of debtors); *KACT, Inc.* v. *Rubin*, 62 Mass. App. Ct. 689, 696 (2004) (unit owners in condominium waived provisions of G. L. c. 183A). Although the phase II owners argue to the contrary, it is apparent that it is private property rights, not public rights, that are protected by the proportionality provision of § 5 (*a*), as we now explain.

The purpose of G. L. c. 183A generally is "to clarify the legal status of the condominium in light of its peculiar characteristics." *Queler* v. *Skowron*, 438 Mass. 304, 312 (2002), quoting *Grace* v. *Brookline*, 379 Mass. 43, 52 (1979). See *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp.*, 407 Mass. 123, 128 (1990), *S.C.*, 412 Mass. 309 (1992); *Barclay* v. *DeVeau*, 384 Mass. 676, 682 (1981). The condominium statute is "essentially an enabling statute, setting out a framework for the development of condominiums in the Commonwealth, while providing developers and unit owners with planning flexibility." *Queler* v. *Skowron, supra.* See *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp., supra*; *Tosney* v. *Chelmsford Village Condominium Ass'n*, 397 Mass. 683, 686-687 (1986); *Barclay* v. *DeVeau, supra.* Such flexibility is "particularly important" for phased condominium developments where "long-term financial and market conditions may be uncertain." *Queler* v. *Skowron, supra.* The statute sets forth certain minimum requirements for the establishment of condominiums, but "those matters that are not specifically addressed in the statute are to be worked out by the involved parties." *Id.* at 312-313. See *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp., supra*; *Tosney* v. *Chelmsford Village Condominium Ass'n, supra.*[24]

Within this overarching purpose of the condominium statute,

---

[24]The phase II owners argue that "only" where G. L. c. 183A "does not address a specific matter may the involved parties resolve an issue by negotiation and agreement." See, e.g., *Queler* v. *Skowron*, 438 Mass. 304, 312-313 (2002) ("While G. L. c. 183A mandates that certain minimum requirements for establishing condominiums be met, those matters that are not specifically addressed in the statute are to be worked out by the involved parties"); *Tosney* v. *Chelmsford Village Condominium Ass'n*, 397 Mass. 683, 686-687 (1986)

the proportionality provision of § 5 (*a*) defines the property rights of individual condominium owners vis-à-vis one another; it does not, as the phase II owners argue, protect the public by mandating uniform requirements as to the percentage interest of ownership of common areas and facilities in all condominia in the Commonwealth. Accord *KACT, Inc.* v. *Rubin, supra* (provisions of G. L. c. 183A "clearly go to the protection of the property rights of the individual condominium unit owners, and not to the general public"). This conclusion is consistent with our interpretations of other sections of G. L. c. 183A. For example, in *Grace* v. *Brookline, supra* at 52-53, this court concluded that in the "context of the entire section and the act as a whole," the "evident intent" of the language in G. L. c. 183A, § 4, that each condominium unit owner "shall be entitled to the exclusive ownership and possession of his unit" is "to define the rights and responsibilities of condominium owners in a particular building vis-à-vis one another."

The phase II owners argue that the general public is protected because "all potential buyers, now and in the future, of later-phase condominium units" will rely on the "built-in fairness provisions" of § 5 (*a*). We cannot agree that protecting the reliance interests of future purchasers is contemplated by the proportionality provision of § 5 (*a*): the assertion is belied by G. L. c. 183A, § 5 (*b*) (2) (iii), which unambiguously contemplates allocations of percentage interests in common areas and facilities that do *not* conform to the default provision of § 5 (*a*).[25]

---

(same); *Barclay* v. *DeVeau*, 384 Mass. 676, 682 (1981) ("Unless expressly prohibited by clear legislative mandate, unit owners and developers may validly contract as to the details of management"); *DiBiase Corp.* v. *Jacobowitz*, 43 Mass. App. Ct. 361, 364 n.5 (1997), *S.C.*, 427 Mass. 1004 (1998) (where condominium statute "does not specifically address" issue, "flexible interpretation" of statute preferred). We agree that the condominium statute, where not explicit, allows involved parties to agree to their own terms. But we do not agree that an explicit provision of G. L. c. 183A may never be waived, and none of the cases relied on by the phase II owners holds as much.

[25] General Laws c. 183A, § 5 (*b*) (2) (iii), grants the organization of unit owners the authority, in certain conditions and following certain procedures, to "[e]xtend, revive or grant rights to develop the condominium . . . upon such terms and conditions as the organization of unit owners may deem appropriate, including the method or formula by which the percentage interest of each unit is to be set in accordance with subsection (a) of section 5, or in accordance with another method which the organization of unit owners reason-

Moreover, as the judge pointed out, there are practical aspects of the operation of the proportionality provision of § 5 (*a*) that weigh against a prohibition of its waiver. He reasoned, correctly in our view, that the proportionality provision is "difficult to follow and enforce." For example, that provision requires that an "approximate" valuation be made at a single moment in time, the recording of the master deed. However, residential real estate valuations are often, in the words of the judge, "fluid and sometimes hard to pinpoint," and values of individual condominium units can and do change over time. Stated differently, § 5 (*a*) is a starting point, and does not contemplate readjustment of the percentage interest each unit owner holds as values of the units fluctuate from time to time.

In addition, a judgment against the phase I owners would, as the judge noted, subvert the well-established public policy of respecting and enforcing litigation settlement agreements. See *Moloney* v. *Boston Five Cents Sav. Bank FSB*, 422 Mass. 431, 435 n.7 (1996) ("Settlement is a favored resolution of litigation . . ."); *LePage* v. *Bumila*, 407 Mass. 163, 166 (1990), quoting *Anonik* v. *Ominsky*, 261 Mass. 65, 67 (1927) ("the law looks with favor upon the settlement of controversies"). The settlement agreement compromised what this experienced judge termed "valuable pending claims," with the intention of establishing definitively the property rights of all parties. We see no reason to set aside the agreement, which effectively is the relief sought by the phase II owners.

Contrary to the argument of the phase II owners, *Strauss* v. *Oyster River Condominium Trust*, 417 Mass. 442 (1994), does not suggest or imply otherwise. In that case, the developer included a provision in a condominium's master deed later held unlawful under G. L. c. 183A, § 5 (*b*). *Id.* at 445.[26] The court concluded that "the fact that the unit owners acquired

ably determines is fair and equitable under the circumstances."

The phase I owners argue that the allocation of interest provisions in the master deed amendment are valid and enforceable pursuant to G. L. c. 183A, § 5 (*b*) (2) (iii). In light of our conclusion on waiver, we need not address the point.

[26]The challenged provision in the master deed in *Strauss* v. *Oyster River Condominium Trust*, 417 Mass. 442, 443 (1994), "purported to authorize each unit owner, with the written approval of a majority of the trustees of the owners' association, 'to construct additions to his Unit.' " The court held that the physical expansions into the common area by individual unit owners "altered

their interests with notice of the existence of the unlawful master deed provision does not bind them to accept it." *Id.* at 447. The circumstances in the *Strauss* decision are different in important aspects from those present here. In *Strauss*, there had been no waiver by agreement of the parties: there was no indication other than that the terms of the master deed were drafted by the developer. See *id.* at 443. Here, in contrast, the developer and the board, representing all of the then unit owners, explicitly agreed to the allocation of interest provisions as part of the settlement agreement. *Strauss* is not controlling.

For all of these reasons, we have no hesitation in concluding that the rights protected by the proportionality provision of § 5(*a*) may be waived by agreement, and any such waiver will not contravene public policy. There is no dispute in this case that the developer agreed to waive, and did waive, those rights.[27] The remaining question as to § 5 (*a*) is whether the phase II owners are bound by that waiver, an issue to which we now turn.

(ii) *Notice to the phase II owners.* The phase II owners argue that, even if the proportionality provision of § 5 (*a*) may be waived, they are not bound by the waiver. The short answer to that claim is that the phase II owners, in the judge's words, "hold their rights and title derivatively of Stuborn," and they purchased their units with notice of the challenged provisions, which are in recorded amendments. Those amendments made clear that the allocation of interests in the common areas and facilities do not comport with the proportionality provision of § 5 (*a*). See *Johnson* v. *Keith*, 368 Mass. 316, 321 (1975) (purchasers of condominium units are bound by terms of recorded master deed); *Viola* v. *Millbank II Assocs.*, 44 Mass. App. Ct. 82, 87 (1997) (same). Cf. *Tosney* v. *Chelmsford Village Condominium Ass'n*, 397 Mass. 683, 688 (1986) (unit owner bound by

the percentage of the undivided interest which each owner had in the common area" and "were unlawful because they were not approved unanimously by the owners," as required by G. L. c. 183A, § 5 (*b*). *Id.* at 445.

[27]The judge concluded that, on the undisputed facts, Stuborn "undeniably and unambiguously waived" any rights it may have had under the proportionality provision of G. L. c. 183A, § 5 (*a*), when it entered into the settlement agreement with the board, the terms of which were, in his words, "clear, unambiguous, and entered in by sophisticated, well-counseled parties." On appeal, the phase II owners do not challenge this aspect of the judge's holding.

recorded agreement between developer and unit owners' association despite lack of specific master deed amendment).

The phase II owners do not dispute that the recorded amendments set forth with specificity (1) the percentage interest allocated to each individual unit owner; (2) the 31.41% to 68.59% division of interest between the phase I and phase II owners; (3) the division of responsibility between the phase I and phase II owners for each category of condominium expenses; and (4) the procedures for electing members of the board and amending the master deed or declaration of trust, all of which gave the phase I owners substantial benefits unmatched by the phase II owners. See notes 19-21 and accompanying text, *supra.* The latter complain that no recorded document stated that the allocations of percentage interest did not conform to the proportionality provision of § 5 (*a*), and that it would have been "impossible" for a phase II unit purchaser to know whether the percentage interest allocations set forth in the recorded amendments reflected the fair value of the phase II units on October 7, 1999, the date the master deed amendment was recorded. A review of the documents belies that claim. The phase II owners recognize that both phase I and phase II consisted, in their words, of "twenty comparable units." But the percentage interest allocations set forth with specificity in the master deed amendment do not reflect "comparability."[28] To the contrary, it is apparent from the master deed amendment that each phase II unit is allocated a substantially greater percentage

---

[28]A table listing, among other things, the floor area, number and types of rooms, and percentage interest allocation of each unit was recorded as part of the master deed amendment; a plan of the completed phase I and phase II units was recorded as part of the same amendment. The table indicates that, of the phase I units, the Naushon units, which ranged in floor area from approximately 3,350 to 3,400 square feet in addition to balconies or terraces ranging from 319.90 to 458.09 square feet, were allocated percentage interests ranging from 1.76 to 1.95 per cent; the Cuttyhunk units, which ranged in floor area from approximately 2,620 to 2,800 square feet in addition to balconies or terraces ranging from 157.46 to 257.87 square feet, were allocated percentage interests ranging from 0.92 to 1.06 per cent. The table indicates that the phase II units, which ranged in floor area from approximately 1,838 to 3,498 square feet in addition to balconies or terraces ranging from sixty-six to 188 square feet, were allocated percentage interests ranging from 2.47 to 4.75 per cent. The sum of the total floor area listed in the table, excluding balconies and terraces, for all the phase I units was approximately 63,258 square feet; the total for the phase II units was approximately 50,402 square feet.

interest than the percentage interest allocated to a phase I unit of approximately equal area and similar room types. There is nothing to suggest that the phase II owners had any reason to believe that the relative market values of the phase I and phase II units on October 7, 1999, the date the master deed amendment was recorded, were so disparate as to reflect the significantly disproportionate allocation of percentage interest between the phase I and phase II units. The disproportionate allocation of expenses is also apparent on the face of the recorded amendments. Thus, the phase II owners were on notice that every purchaser of a phase II unit would shoulder the burden of *all* condominium expenses related to construction, maintenance, repair, and replacement of the phase II building and its common areas; would be responsible for one-half of any fees or out-of-pocket expense reimbursements paid to any professional management company; and would be responsible for 68.59% of "other" potentially far greater "common expenses." See note 19, *supra.*

The phase II owners argue that they could not have been on notice that the allocation of interest provisions did not comport with § 5 (*a*) because several provisions of the *original* master deed in effect stated that, on the completion of phase II, the master deed would remain consistent with the terms of G. L. c. 183A. We disagree. As explained, the recorded amendments make clear that the allocation of interest among the phase I and phase II units did not conform to the proportionality provision of § 5 (*a*). The phase II owners may not now avoid the consequences of the contract they signed when they purchased their units with full notice of the conflict between the allocation of interest provisions and G. L. c. 183A, § 5 (*a*), by reference to general provisions concerning statutory conformance contained in the original master deed.[29]

"The ability of those interested in purchasing a condominium

---

[29]The phase II owners argue that permitting waiver of the proportionality provision of § 5 (*a*) by the developer to bind future owners on notice of the waiver will create a "significant incentive for earlier phase unit owners to extract as much from the developer as possible, and for a developer to agree to any concessions that will lead to extended, expanded, or altered development rights." Whatever the validity of that speculation, any waiver by a developer will bind purchasers of units in later developed phases only where, as here, the units are purchased with notice of the "extractions." Because any significant impairment of the rights of future purchasers of the development

unit to know from an examination of the property records, and in particular the master deed, whether there are any limitations on the estate that they hope to acquire is a substantial public interest. . . ." *Queler* v. *Skowron*, 438 Mass. 304, 313 n.16 (2002). Our decision here reaffirms the importance of that interest. The recorded amendments placed the phase II owners on notice of the precise nature of the estate that each purchased.

b. *Management provisions*. We turn finally to the phase II owners' challenge to the management provisions in the trust amendment. Those provisions established the method for electing members of the board and prevented amendments to the master deed or declaration of trust adverse to the interests of the phase I owners without the consent of sixty-seven per cent of those owners. The phase II owners argue that these provisions violate G. L. c. 183A, § 10 (*a*), which, as noted earlier, states that each unit owner "shall have the same percentage interest in the corporation, trust or unincorporated association provided for in the master deed for the management and regulation of the condominium as his proportionate interest in the common areas and facilities." See note 8, *supra*. We agree with the judge that the provisions do not violate § 10 (*a*), and reject the claim.

This court has previously recognized that the requirement in § 10 (*a*) that unit owners in a condominium have a proportionate interest in a condominium's association of unit owners is "not free of ambiguity." *Barclay* v. *DeVeau*, 384 Mass. 676, 680 (1981) (*Barclay*). The required "interest" may include a "power to appoint and remove the trustees of the condominium trust" that may not be diluted; alternatively, the "proportionate interest in the unit owners' association may be a beneficial one that includes, for example, rights in event of casualty losses (G. L. c. 183A, § 17) and the right to make and the obligation to pay for capital improvements (G. L. c. 183A, § 18), without including proportionate management rights." *Barclay*, *supra* at 679-680. The court in *Barclay* reviewed the legislative history of G. L. c. 183A and concluded that the Legislature "apparently intended to leave the matter of who shall control the management of the common areas and facilities of the condominium to

will, in all likelihood, impair the market value of those units to the detriment of the developer, we see no reason to undo the settlement agreement in this case on those grounds.

discretionary agreement among the unit owners and the developer." *Id.* at 681. The court saw "no strong public policy against interpreting c. 183A, § 10 (*a*), to permit the developer and unit owners to agree on the details of administration and management of the condominium unit. Public policy actually favors this interpretation," and nothing in G. L. c. 183A "prohibits the unit owners from entering into valid agreements for management and control of the condominium." *Id.* at 679, 682-683. The management provisions at issue here are the result of such an agreement. They do not violate G. L. c. 183A, § 10 (*a*).

*Barclay* cautions that agreements that are the product of "over-reaching" or "fraud" may not be enforceable. *Id.* at 682. The phase II owners argue that the management provisions at issue here were the result of such "overreaching" by the board. We see nothing to substantiate the claim. The recorded amendments were the result of a settlement agreement reached at arm's length by parties represented by counsel. Both parties had much to lose: Stuborn's development rights were soon to expire, while the phase I owners were faced with the prospect of development of phase II following plans that substantially differed from those contemplated by the original master deed. The dismissal of the board's Land Court action challenging Stuborn's revised plans was, as the judge observed, "significant" because further litigation would have been barred by the applicable statute of limitations. Moreover, by maintaining the 31.41% to 68.59% division of interest established in 1989, the settlement agreement left undisturbed expectations of the phase I owners created by the original master deed concerning their percentage interest in the fully developed condominium. The condominium statute expressly protects such expectations. See G. L. c. 183A, § 5 (*b*) (1) (percentage interest of each unit owner "shall not be altered without the consent of all unit owners whose percentage of the undivided interest is affected, expressed in an amended master deed duly recorded"). The settlement agreement balanced the interests of the developer and the board[30]; there was no impermissible "overreaching" by any party. *Barclay, supra.*[31]

---

[30]Were the phase I owners to lose their control of the board and the veto they hold over further amendments to the master deed or declaration of trust adverse to their interests, the phase II owners would be able effectively to undo the terms of the settlement agreement.

[31]The phase II owners also argue that the holding in *Barclay* v. *DeVeau,*

3. *Conclusion.* For the foregoing reasons, the master deed and declaration of trust, both as amended by the recorded amendments, are valid and enforceable in accordance with their terms.

*Judgment affirmed.*

---

384 Mass. 676 (1981) (*Barclay*), applies only when differences between the unit owners' proportionate control of condominium management and their percentage interest in the common areas exist for a "limited" and "reasonable" time. In the *Barclay* decision, the court upheld an agreement between the developer and unit owners that granted the developer the right to designate two out of three members of the board until the developer owned fewer than twelve units, noting that "a limitation of a reasonable period of time is properly placed on such a clause." *Id.* at 677, 684. The court's focus was on the particular circumstances of "an agreement designed to protect the *developers'* interests during the development and marketing phase of a condominium" (emphasis added). *Id.* at 684. That is not the case here.