NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12327


TRUSTEES OF THE CAMBRIDGE POINT CONDOMINIUM TRUST  vs.
CAMBRIDGE POINT, LLC, & others.[1]



Middlesex.      October 5, 2017. - January 19, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Condominiums, By-laws, Management, Common area.  Real Property,
     Condominium.  Public Policy.




     Civil action commenced in the Superior Court Department on
April 3, 2014.

     A motion for partial summary judgment was heard by Rosalind
H. Miller, J.; a motion for reconsideration was considered by
her; and motions to dismiss were heard by Peter B. Krupp, J.

     The Supreme Judicial Court granted an application for
direct appellate review.



     Edmund A. Allcock for the plaintiffs.
     John F. Gleavy for CDI Commercial Development, Inc., &
another.
     David Aleksic, for Frank Fodera & another, was present but
did not argue.

_____

     [1] Northern Development, LLC; CDI Commercial Development,
Inc.; Giuseppe Fodera; Frank Fodera; Frank Fodera, Jr.; and
Anahid Mardiros.

David T. Keenan, for Anahid Mardiros, was present but did not argue.

Henry A. Goodman & Ellen A. Shapiro, for Community Associations Institute, amicus curiae, submitted a brief.

Cailin M. Burke, Julie B. Heinzelman, Diane R. Rubin, Thomas O. Moriarty, & Kimberly A. Bielan, for Real Estate Bar Association for Massachusetts, Inc., & another, amici curiae, submitted a brief.

GANTS, C.J.  In this action, a condominium trust's board of trustees has filed suit against the developers of the condominium for damages arising from various design and construction defects in the condominium's common areas and facilities.  The condominium bylaws, however, provide that the trustees cannot bring any litigation involving the common areas and facilities against anyone other than a unit owner unless they first obtain the consent of at least eighty per cent of the unit owners.  The issue on appeal is whether this bylaw provision is void, either because it violates the Condominium Act (act), G. L. c. 183A, or because it contravenes public policy.  We conclude that it is void because it contravenes public policy.[2]

Background.  In 2007, Cambridge Point, LLC, as the declarant of a predominantly residential forty-two-unit condominium in Cambridge, filed in the Middlesex South District registry of deeds a master deed, a declaration of trust, and the

---

[2] We acknowledge the amicus briefs submitted by the Community Associations Institute and by the Real Estate Bar Association for Massachusetts, Inc., and the Abstract Club.

bylaws of the Cambridge Point Condominium Trust (trust).  The trust's board of trustees (trustees) is responsible for administering the affairs of the trust.  Among the powers and duties committed to the trustees is the authority under § 1(o) of the bylaws to "conduct[] litigation as to any course of action involving the common areas and facilities."  However, this authority is limited by a condition precedent that requires the trustees, before initiating any litigation against anyone who is not a unit owner, (1) to deliver a copy of the proposed complaint to all unit owners; (2) to specify a monetary limit of the amount to be paid as legal fees and costs in the proposed litigation; (3) to inform all unit owners that, if they consent to the initiation of the litigation, they will forthwith be separately assessed this amount of legal fees and costs as a special assessment; and (4) within sixty days after a copy of the proposed complaint has been delivered to the unit owners, to receive the written consent of not less than eighty per cent[3] of all unit owners to bring the litigation.[4]

---

[3] Section 32 of the condominium's bylaws defines "[p]ercentage of [u]nit [o]wners" as "the owners of the specified percentage in the aggregate in interest of the undivided ownership in the common areas and facilities of the [c]ondominium."

[4] Section 1(o) of the condominium's bylaws provides in relevant part:

"The [b]oard of [t]rustees shall have all powers necessary

In 2012, the trust began receiving complaints from unit owners about pervasive water leaks, which were infiltrating and damaging the building envelope, eventually causing a mold

---

for administering the affairs of the [c]ondominium as set forth in [G. L. c. 183A] . . . . Such powers and duties of the [t]rustees shall include, but shall not be limited to, . . .

(o) conducting litigation as to any course of action involving the common areas and facilities . . . .

"Notwithstanding any provision of the [m]aster [d]eed, or the [d]eclaration of [t]rust of the [c]ondominium [t]rust, or of these [b]ylaws or the [r]ules and [r]egulations to the contrary, neither the [t]rustees acting in their capacity as such [t]rustees or acting as representatives of the [u]nit [o]wners, nor any class of the [u]nit [o]wners shall bring any litigation whatsoever unless a copy of the proposed complaint in such litigation has been delivered to all of the [u]nit [o]wners, and not less than eighty [per cent] (80%) of all [u]nit [o]wners consent in writing to the bringing of such litigation within sixty (60) days after a copy of such complaint had been delivered to the [u]nit [o]wners and specifying as part of the written consent a specific monetary limitation to be paid as legal fees and costs and expenses to be incurred in connection therewith, which amount shall be separately assessed as a special assessment effective forthwith at the time of said affirmative consent. Notwithstanding any provisions of the [m]aster [d]eed, or of the [d]eclaration of [t]rust of the [c]ondominium [t]rust . . . or these [b]ylaws or the [r]ules and [r]egulations, the provisions of this [p]aragraph . . . shall not be amended except by vote of at least eighty [per cent] (80%) of [u]nit [o]wners. The provisions of this [p]aragraph (o) shall not apply to litigation by the [c]ondominium [t]rust against [u]nit [o]wners with respect to the recovery of overdue [c]ommon [e]xpenses or [s]pecial [a]ssessments or to foreclose the lien provided by [G. L. c. 183A, § 6], and [G. L. c. 254, §§ 5 and 5A], . . . or to enforce any of the provisions of the [m]aster [d]eed, or the [d]eclaration of [t]rust of the [c]ondominium [t]rust, or these [b]ylaws . . . , or the unit deed, against [u]nit [o]wners . . . ."

infestation both on the exterior sheathing of the building envelope and within individual units. An investigation conducted by an engineering firm in 2013 identified myriad design and construction defects with the condominium. When the trust's demands that the developers repair the defective construction proved futile, the trust sought out a contractor to repair the building, who estimated the costs of repair as exceeding $2 million.

On April 3, 2014, after having delivered to the unit owners the proposed complaint and a statement of the estimated legal fees and costs of the litigation, but without having received the written consent of at least eighty per cent of the unit owners, the trustees filed a verified complaint in the Superior Court against the developers of the condominium[5] alleging negligence, breach of the implied warranty of habitability, negligent misrepresentation, fraudulent misrepresentation and concealment, and breach of fiduciary duty. In their complaint,

---

[5] We refer to all of the defendants as "developers of the condominium" but recognize that the defendant Anahid Mardiros does not appear to have participated in the drafting of the condominium documents or the development and maintenance of the condominium. She has filed a separate brief, claiming that her only affiliation with the other defendants is as a trustee of the Cambridge Point Nominee Trust, which is not a defendant here. To resolve this appeal, we need not (and do not) address whether Mardiros is properly a defendant in this action. We also note that, pursuant to a stipulation by the parties, the claims against the defendant Frank Fodera, Jr., were dismissed prior to the judgment of dismissal at issue in this appeal.

the trustees also sought a judgment declaring that § 1(o) of the bylaws is void.  They alleged that, because the developers and their affiliates had "reserved for themselves, and continue to own, enough units to prevent an [eighty per cent] supermajority of [u]nit [o]wners to authorize the [t]rust to institute a lawsuit," § 1(o) effectively prevented them from obtaining legal redress.[6]

The trustees moved for partial summary judgment on their claim seeking a judgment declaring that § 1(o) of the bylaws is void.  The first motion judge denied the motion.[7]  The developers then moved to dismiss the complaint on the grounds that the trustees had not obtained the minimum level of consent required under § 1(o).  The second motion judge allowed the motions to dismiss, concluding that the act "does not prohibit adoption of a bylaw that requires a percentage of unit owners to consent to litigation before litigation is filed by the trustees of a condominium," and that the requirements of § 1(o) did not

---

[6] The trustees also sought a judgment declaring that § III(i) of the declaration of trust, which provides for the indemnification of the trustees "against any liability incurred by them," is void, but neither motion judge addressed this claim and it is not before us on appeal.

[7] The first motion judge initially ruled that the trustees could proceed with the litigation if they obtained the consent of eighty per cent of the "disinterested unit owners," defined as those who had neither business, financial, nor familial ties to the developers, but, on reconsideration, she determined that under § 1(o), the litigation required the consent of at least eighty per cent of all unit owners.

constitute "overreaching" in contravention of public policy where the unit owners knew or should have known of these requirements prior to purchasing a unit.  The trustees appealed, and we granted their application for direct appellate review.

Discussion.  The trustees argue that the provisions in § 1(o) of the bylaws requiring them to obtain the consent of at least eighty per cent of the unit owners before initiating litigation against the developers are void for two reasons:  (1) they circumscribe the power of the trustees to conduct litigation, in violation of the act; and (2) they effectively shield the developers from any litigation brought on behalf of the unit owners for defects in the construction and design of the condominium, in contravention of public policy.  We address each argument in turn.

1.  Does the act prohibit any requirement of unit owner consent before the trustees may initiate litigation?  Under § 10 (b) (4) of the act, a condominium trust, as the entity granted the authority to manage the common areas and facilities of the condominium, "shall have, among its other powers, the . . . rights and powers . . . [t]o conduct litigation . . . as to any course of action involving the common areas and facilities."  We have recognized that, where there are defects or other problems in the common areas and facilities, the authority of a condominium trust to seek a remedy through

litigation is "exclusive." Berish v. Bornstein, 437 Mass. 252, 265 (2002). "[C]ondominium unit owners cede the management and control of the common areas to the organization of unit owners, which is the only party that may bring litigation relating to the common areas of the condominium development on their behalf." Id. at 263. See Strauss v. Oyster River Condominium Trust, 417 Mass. 442, 445 (1994) ("Only the trustees have the right to conduct litigation concerning 'common areas and facilities'" [citation omitted]). The trustees contend, in essence, that, because the act provides that they are the only party that may commence litigation to obtain compensation for damages arising from construction and design defects in the common areas, the act implicitly prohibits any bylaw provision that requires the trustees to obtain the consent of the unit owners before filing suit.

We are not persuaded that every bylaw that requires unit owner consent before the trustees may initiate litigation is in violation of the act. The act is "essentially an enabling statute, setting out a framework for the development of condominiums in the Commonwealth, while providing developers and unit owners with planning flexibility." Scully v. Tillery, 456 Mass. 758, 769 (2010), quoting Queler v. Skowron, 438 Mass. 304, 312 (2002). It "sets forth certain minimum requirements for the establishment of condominiums, but 'those matters that are not

specifically addressed in the statute are to be worked out by the involved parties.'"  Scully, supra, quoting Queler, supra at 312-313.  Matters not specifically addressed by the act may be undertaken through the condominium bylaws, provided they are not "inconsistent" with the act or the master deed.  See G. L. c. 183A, § 12 (d) ("The [bylaws] may also provide . . . [s]uch other provisions as may be deemed necessary for the management and regulation of the organization of unit owners or the condominium not inconsistent with [G. L. c. 183A] and the master deed").

The act declares that the "organization of unit owners," as defined in G. L. c. 183A, § 1 -- here, the trust -- has the power to "manage, and otherwise deal with" common areas and facilities of the condominium.  G. L. c. 183A, § 10 (b) (1). However, the act does not grant unbridled authority to the trust with respect to every management decision that affects common areas and facilities.  For example, it requires the agreement of at least seventy-five per cent of the unit owners to repair or restore a condominium in the event it suffers a casualty loss that exceeds ten per cent of the value of the condominium. G. L. c. 183A, § 17 (b) (1).  It also provides that improvements to the common areas and facilities may not be treated as a "common expense" borne collectively by the unit owners unless at least seventy-five per cent of the unit owners agree to make the

improvements.  G. L. c. 183A, § 18 (b).  The existence of these provisions in the act suggests that the Legislature did not believe that a condominium trust's power to manage the common areas and facilities is necessarily inconsistent with a requirement of unit owner consent for certain management decisions.

The trustees contend that, because the Legislature included provisions in the act requiring unit owner consent under some circumstances, but failed to include any comparable provision governing the initiation of litigation, we can therefore infer that the Legislature intended to prohibit any bylaw requiring unit owner consent for litigation.  "However, the maxim of negative implication -- that the express inclusion of one thing implies the exclusion of another -- 'requires great caution in its application.'"  Halebian v. Berv, 457 Mass. 620, 628 (2010), quoting 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47.25, at 429 (7th ed. 2007).  Such caution is especially appropriate here, given the enabling nature of the act and the wide latitude and flexibility it provides developers and unit owners to craft arrangements not specifically addressed by the act.  See Scully, 456 Mass. at 769.  We cannot reasonably infer that, because the act requires unit owner consent for some management decisions, the Legislature intended to prohibit any bylaw requiring unit owner

consent for <u>other</u> management decisions, including the decision to commence litigation concerning common areas or facilities. See <u>Halebian</u>, <u>supra</u>, quoting 2A N.J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction, <u>supra</u> at § 47.25, at 433-435 (maxim of negative implication "will be disregarded . . . where its application would thwart the legislative intent made apparent by the entire act"). See also <u>Bank of Am., N.A.</u> v. <u>Rosa</u>, 466 Mass. 613, 619-620 (2013). Such an inference would require a clearer indication of legislative intent than mere negative implication. See generally <u>Globe Newspaper Co.,</u> <u>petitioner</u>, 461 Mass. 113, 119 (2011) (applying maxim of negative implication would yield result not intended by Legislature). Therefore, we conclude that a bylaw provision requiring unit owner consent to initiate litigation is not per se void because it is "inconsistent" with the act under § 12 (<u>d</u>).

2. <u>Is this particular bylaw void because it contravenes</u> <u>public policy</u>? Having determined that the act does not bar <u>every</u> bylaw provision requiring unit owner consent prior to litigation, we now consider whether <u>this</u> bylaw provision is void because it contravenes public policy. We begin by recognizing that the bylaw provision's requirement of the consent of at least eighty per cent of all unit owners makes it effectively impossible for the trustees to sue the developers of a

condominium for damages arising from the defective construction and design of common areas or facilities where, as here, the developers or their affiliates retain an ownership interest in at least twenty per cent of the units.[8]  The developers are not likely to agree to sue themselves.  And if the trustees cannot file suit against the developers, no one can, because their authority to bring such a suit is "exclusive" as to the common areas and facilities of the condominium.  See Berish, 437 Mass. at 265.  Moreover, if the developers or their affiliates were to retain at least a twenty per cent ownership interest in the units for more than six years, they could effectively prevent any suit from being brought against them for design or construction defects in the common areas or facilities because the statute of repose would bar any subsequent suit.  See G. L.

---

[8] Giuseppe Fodera, Frank Fodera, and Frank Fodera, Jr., formed, and currently manage, the defendant Cambridge Point, LLC.  These three individuals contemporaneously formed, and currently manage, defendant Northern Development, LLC, the general contractor of the condominium.  These three individuals and their affiliates owned at least 20.36 per cent of the beneficial interest in the condominium units:  Giuseppe owned a 5.58 per cent beneficial interest; Ciross, LLC, owned by Giuseppe's wife, owned a 6.54 per cent beneficial interest; a limited liability corporation owned by Giuseppe's relative owned a 3.49 per cent beneficial interest; and a trust formed by Frank Fodera, who appointed his lawyer as the trustee, owned a 4.75 per cent beneficial interest.  Consequently, even without considering Mardiros's 14.87 per cent beneficial interest, see note 5, supra, the developers and their affiliates alone could have thwarted any attempt by the trustees to initiate litigation against the developers for defects in construction in the common areas and facilities.

c. 260, § 2B (six-year statute of repose for tort actions for damages arising out of deficiency or neglect in design, planning, construction, or general administration of improvement to real property).[9]

Even if the developers or their affiliates did not retain a twenty per cent ownership interest, the provisions of § 1(o), in their entirety, make it extraordinarily difficult for the trustees to sue the developer for defective construction and design of common areas or facilities.  First, the bylaw provisions require the consent of at least eighty per cent of all unit owners, so if the developers retain any ownership interest in the units, the trustees would need to obtain the consent of more than eighty per cent of the unit owners who are not affiliated with the developers -- and perhaps all of them, if the developers have retained nearly twenty per cent of the units.  Second, because the trustees must obtain the affirmative consent of at least eighty per cent of all unit owners, any unit owner who fails to respond to the request for written consent is treated as if he or she refused such consent, regardless of whether the unit owner is ill, has rented out the unit and is

---

[9] Even if the developers or their affiliates were to retain at least a twenty per cent ownership interest in the units for just three years, any such suit might also be barred by the statute of limitations, depending upon the date the cause of action accrued.  See G. L. c. 260, § 2B (actions in tort for negligent design or construction "shall be commenced only within three years after the cause of action accrues").

presently unavailable, or is simply unwilling to make a decision. Contrast Fla. Stat. § 720.303(1) (homeowners association required to "obtain the affirmative approval of a majority of the voting interests [present] at a meeting of the membership at which a quorum has been attained" prior to litigating any matter in which amount in controversy exceeds $100,000). Third, the bylaw provides that the entirety of the legal fees and costs to be incurred from litigation must be "separately assessed as a special assessment effective forthwith" upon consent, even though the legal fees and costs would be incurred and billed during the life of the litigation. See Mass. R. Prof. C. 1.15 (b) (3), as appearing in 471 Mass. 1380 (2015) (even where retainer paid in advance, lawyer may not withdraw funds until fees earned or expenses incurred). Fourth, the trustees have only a brief time frame of sixty days to obtain the required written consent from the unit owners. Cumulatively, these requirements function as a formidable hurdle that the trustees are required to surmount before commencing litigation against the developers.

We have long recognized that "the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases [a] contract will not be enforced." Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996). "The grounds for a public policy exception must be

clear in the acts of the Legislature or the decisions of this court."  Miller v. Cotter, 448 Mass. 671, 683 (2007).
See Beacon Hill Civic Ass'n, supra at 321 ("'Public policy' in this context refers to a court's conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare").  Consequently, we must consider whether a bylaw that makes it extraordinarily difficult -- and in this case, effectively impossible -- to obtain redress for a developer's defective construction and design of common areas and facilities is void because it is contrary to public policy.

Massachusetts has a well-established public policy in favor of the safety and habitability of homes, as reflected in our implied warranty of habitability under common law and in the legislative enactment of building codes.  In Albrecht v. Clifford, 436 Mass. 706, 710-711 (2002), we expanded our implied warranty of habitability under common law, holding that it attaches not only to residential leases but also to "the sale of new homes by builder-vendors in the Commonwealth."  The purpose of this implied warranty is "to protect a purchaser of a new home from latent defects that create substantial questions of safety and habitability."  Id. at 711.  Cf. Boston Hous. Auth. v. Hemingway, 363 Mass. 184, 199 (1973) ("[I]n a rental of any premises for dwelling purposes, under a written or oral

lease, for a specified time or at will, there is an implied warranty that the premises are fit for human occupation"). Although the precise scope of the warranty depends on the circumstances of the case, "a home that is unsafe because it deviates from fundamental aspects of the applicable building codes, or is structurally unsound, or fails to keep out the elements because of defects of construction, would breach the implied warranty."  Albrecht, supra.  We have emphasized that "[the implied warranty] cannot be waived or disclaimed, because to permit the disclaimer of a warranty protecting a purchaser from the consequences of latent defects would defeat the very purpose of the warranty."  Id.  Cf. Boston Hous. Auth., supra ("This warranty [insofar as it is based on the State [s]anitary [c]ode and local health regulations] cannot be waived by any provision in the lease or rental agreement").

"The policy reasons that led us to adopt an implied warranty of habitability in the purchase of a new home apply equally to the purchase of a new condominium unit."  Berish, 437 Mass. at 263.  In Berish, supra, we therefore held that an implied warranty of habitability attaches to the sale of new residential condominium units by builder-vendors.[10]  At the same

---

[10] "A claim for breach of this implied warranty may be brought by an individual unit owner who can establish that (1) he purchased a new residential condominium unit from the builder-vendor; (2) the condominium unit contained a latent

time, we recognized that "the protections afforded [to] purchasers of newly constructed condominium units by this implied warranty against latent defects in their own units may not be adequate to ensure the habitability of those units" because improper design, material, or workmanship that causes a defect in a common area might cause units to be uninhabitable or unsafe.  Id. at 264-265.  "To ensure that there is a complete remedy for a breach of habitability in the sale of condominium units, we conclude[d] that an organization of unit owners" -- such as a condominium trust -- "may bring a claim for breach of the implied warranty of habitability when there are latent defects in the common areas that implicate the habitability of individual units."  Id. at 265.[11]

A developer of a condominium not only is subject to the

_____

defect; (3) the defect manifested itself to the purchaser only after its purchase; (4) the defect was caused by the builder's improper design, material, or workmanship; and (5) the defect created a substantial question of safety or made the condominium unit unfit for human habitation."  Berish v. Bornstein, 437 Mass. 252, 264 (2002).

[11] To establish a claim for the breach of the implied warranty of habitability, the condominium trust must demonstrate that:  "(1) it is an organization of unit owners as defined by G. L. c. 183A, § 1; (2) the common area of the condominium development contains a latent defect; (3) the latent defect manifested itself after construction of the common areas was substantially completed; (4) the defect was caused by the builder's improper design, material, or workmanship; and (5) the defect created a substantial question of safety as to one or more individual units, or made such units unfit for human habitation."  Berish, 437 Mass. at 265-266.

implied warranty of habitability but also must comply with the minimum standards prescribed by the building code.  See 780 Code Mass. Regs. § 114.1 (2017) ("It shall be unlawful for any person, firm[,] or corporation to erect [or] construct . . . any building, structure[,] or equipment regulated by [the building code] . . . in violation of any of [its] provisions . . .").  The purpose of the building code "is to establish the minimum requirements to safeguard the public health, safety[,] and general welfare . . . ."  780 Code Mass. Regs. § 101.3 (2017).  The importance of adherence to the building code is evident from the fact that, in certain circumstances, a building code violation may also result in liability under G. L. c. 93A, pursuant to the Attorney General's regulation, 940 Code Mass. Regs. § 3.16(3) (1993), which provides, among other things, that an act or practice may constitute unfair or deceptive conduct within the scope of G. L. c. 93A if it "fails to comply with existing statutes, rules, regulations[,] or laws, meant for the protection of the public's health, safety, or welfare."  See Klairmont v. Gainsboro Rest., Inc., 465 Mass. 165, 170 (2013) (building code violation may constitute violation of G. L. c. 93A, § 2 [a], if underlying conduct is unfair or deceptive, and occurs in trade or commerce).  Importantly, where a claim under G. L. c. 93A, § 2 (a), arises from a building code violation, that claim cannot be waived because such a waiver

could "do violence to the public policy underlying the legislative enactment."  Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 378 (1990), quoting Spence v. Reeder, 382 Mass. 398, 413 (1981).  See Downey v. Chutehall Constr. Co., 88 Mass. App. Ct. 795, 800-801 (2016) (waiver of building code requirements by homeowner does not preclude contractor's liability for G. L. c. 93A violation arising from building code violation "where there are possible consequences for the safety of the homeowner and others").

In sum, it is "clear [from] the acts of the Legislature [and] the decisions of this court," Miller, 448 Mass. at 683, that the public policy of Massachusetts strongly favors the safety and habitability of homes.  In order to effectuate this public policy, we have consistently recognized the rights of individuals to obtain legal redress when their homes fail to meet minimum standards.  These rights -- whether grounded in the implied warranty of habitability or in the building code as enforced through G. L. c. 93A -- are so vital that we have consistently held that they cannot be waived.

This clear expression of public policy leads us to conclude that a condominium bylaw provision that effectively limits the ability of unit owners to obtain legal redress for violations of these rights must be carefully scrutinized to determine whether it contravenes that public policy.  For example, if a bylaw were

to provide that the unit owners waive all claims against the developers for any defects in construction, we would surely declare such a bylaw void as contravening public policy to the extent that it sought to waive the unwaivable claims based on the implied warranty of habitability and G. L. c. 93A, § 2 (a). And we surely would not enforce such a sweeping waiver to the extent that it would shield the developers from claims of gross negligence. See Maryland Cas. Co. v. NSTAR Elec. Co., 471 Mass. 416, 422 (2015), quoting Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 19 (1997) ("[It is a] well-established principle of contract law . . . that, 'while a party may contract against liability for harm caused by its negligence, it may not do so with respect to its gross negligence'"). See also CSX Transp., Inc. v. Massachusetts Bay Transp. Auth., 697 F. Supp. 2d 213, 226 (D. Mass. 2010) ("[T]he [Supreme Judicial Court] would not enforce agreements purporting to require indemnification against gross negligence").

But the bylaw provision here, in practical effect, is even more sweeping and more unfair than this hypothetical bylaw provision. It is more sweeping because, as here, where the developers and their affiliates control more than twenty per cent of the units, this provision effectively prevents the trustees from bringing any claim in litigation against the developers for defects in construction or design, regardless of

whether the claim is for a breach of the implied warranty of habitability, a violation of G. L. c. 93A, or any other claim (including gross negligence, fraud, or intentional misconduct).

And it is more unfair than the hypothetical bylaw provision because its practical effect would likely not be immediately apparent to a reasonable prospective purchaser.  If, under our hypothetical bylaw provision, unit owners were required to waive all claims against the developers for defects in construction or design, a prospective purchaser -- if he or she had reviewed the bylaws in the registry of deeds -- would know that he or she would have no legal recourse against the developers for any defects in construction or design of the common areas and facilities of the condominium.  A reasonable prospective purchaser, however, would not necessarily understand from the terms of § 1(o) the absence of legal recourse (or the severity of the impediments to legal recourse), because the prospective purchaser would not know how many condominium units the developers intended to retain, and for how long.  Without this information, a prospective purchaser could not know whether § 1(o) is simply a provision that requires consent from eighty per cent of the unit owners before initiating litigation, or a provision that, in effect, will shield the developers from any and all legal claims by the trustees.

In Barclay v. DeVeau, 384 Mass. 676, 682 (1981), we

declared that "[a]bsent overreaching or fraud by a developer, we find no strong public policy against interpreting c. 183A, § 10 (a), to permit the developer and unit owners to agree on the details of administration and management of the condominium unit" (footnote omitted).  We conclude that it is overreaching for a developer to impose a condition precedent that, for all practical purposes, makes it extraordinarily difficult or even impossible for the trustees to initiate any litigation against the developers regarding the common areas and facilities of a condominium.  Such a provision has all the same flaws as a waiver of liability provision -- which we would find void as contravening public policy -- but without the transparency of such a provision.  We therefore conclude that § 1(o) of the bylaws, viewed in light of the totality of the circumstances, is void because it contravenes public policy.[12]

Conclusion.  We vacate the judgment of dismissal of the verified complaint, order the grant of partial summary judgment on so much of the trustees' declaratory judgment claim as seeks a declaration that § 1(o) of the bylaws is void as contravening

_____

[12] Because we reach this conclusion, we need not (and do not) address the trustees' other arguments that § 1(o) of the bylaws denies access to the courts in violation of art. 11 of the Massachusetts Declaration of Rights, or that the provision invades the attorney-client relationship and privilege by requiring the trustees to provide unit owners with a draft of the complaint and an estimate of the legal fees and costs to be incurred in the proposed litigation.

public policy, and remand the matter to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.